NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

KNUTH BROTHERS, INC., Respondent.

No. 75–1715.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 12, 1976.
Decided July 8, 1976.

951

Elliott Moore, Deputy Assoc. Gen. Counsel, Ruth Deters and John S. Irving, Jr., Attys., N. L. R. B., Washington, D. C., for petitioner.

Gary A. Marsack, Milwaukee, Wis., for respondent.

Before CASTLE, Senior Circuit Judge, and PELL and TONE, Circuit Judges.

PELL, Circuit Judge.

In this case the National Labor Relations Board is petitioning for enforcement of an order requiring respondent, Knuth Brothers, Inc., to reinstate a former employee, to grant him back pay, and to post appropriate notices. In issue is whether respondent committed an unfair labor practice within the meaning of the National Labor Relations Act by discharging an employee who revealed information which the respondent regarded as confidential and which could have jeopardized respondent's business relationships.

Respondent is a wholesale printer of business forms. It has no sales force of its own; and except for a few house accounts which it retained from a time when it had a sales force, it receives all its business from dealers who sell to the ultimate users. Knuth's continuance as a successful business is thus almost entirely dependent upon the efforts (and obviously the good will) of its dealers in selling its print production. Respondent has no contact with the ultimate users, and any clarifications needed in the course of a job are obtained through the dealer. Respondent has designated certain individuals to make such contacts. Dealers frequently do not reveal that they are subcontracting work or to whom they are subcontracting for fear the user may try to eliminate them as a middleman and deal directly with the printer, thereby securing a lower price for the work. Respondent often ships orders directly to the ultimate user; but when it does so, it makes the shipment in the dealer's name and its own name does not appear. While employees apparently were not explicitly warned not to contact ultimate consumers, new employees, including the discharged employee in the present

**952**

case, undoubtedly became aware of the nature of the business and were told: "We have no contact with the end user customer."

At the pertinent times, respondent's pressmen were members of Milwaukee Printing Pressmen and Assistants Union No. 7, but the production employees were not organized. The events which led to this case occurred during a union campaign to organize the production employees. Philip Popovitch, a pressman, was very active in the organizational campaign. It was the pressmen's opinion that they would have greater bargaining power if the whole plant became organized.

During the course of his work for the respondent, Popovitch noticed that a job was being done for the Schlitz Brewing Company, an organized employer and an end user customer with whom Knuth had no direct business relationship.[1] Popovitch called Schlitz and spoke to an employee in that company's public relations department. Popovitch made no effort to get in touch with the dealer who had sub-contracted the Schlitz job to Knuth. After talking to a man in the public relations department, Popovitch was referred to a woman, Janet Wisch, in the purchasing department at Schlitz and substantially repeated the message given to the PR department. According to Popovitch, he related that in the shop at which he worked, which was subsequently identified, the pressmen were organized and that there was an organizing campaign going on for the balance of the shop and that "we did have a job in our plant from Schlitz." Then according to his testimony: "[I]t seems to me I asked her if we were getting the work from Schlitz because we

were union, or does Schlitz give work to union people, non-union people, or if it didn't make any difference."

Popovitch had made the call because it had seemed strange to him that Knuth was getting work from Schlitz but that he had thought it would be beneficial to the balance of the group of people being organized if they knew they were getting work from union people.

Wisch's recollection of the conversation was that he "was wondering why he had a job in his plant, since they were not union and we were." She disclaimed any knowledge of the work being done and told Popovitch she would need to know the name of the dealer, the name of the salesman, and a description of the job. Popovitch secured this information and called Wisch back to give it to her. She said she would get in touch with the dealer; and according to Popovitch, she observed that "it doesn't seem right that the work should go to a non-union shop."

The dealer was Prismagraphics and the salesman was Scott Schmaelzle, son of the owner. Prismagraphics was Knuth's first and oldest dealer account and was responsible for some $100,000 worth of business at a time when the pressmen were concerned about the lack of work at the plant. After contact by Schlitz, Schmaelzle telephoned Popovitch and asked why he had called Schlitz. Popovitch explained the purpose of his call;[2] and Schmaelzle then informed Popovitch that it was not his concern why respondent got the work and that if Schlitz had not known that Prismagraphics had "farmed out the work," he (the salesman) would have been in trouble.[3] Popovitch

---

1. Popovitch's testimony would indicate that he initiated an inquiry as to the Schlitz work, as detailed hereinafter in the text, shortly after becoming aware of the fact that such work was being done. The record, however, indicates that the Knuth company had been doing work for Schlitz since at least 1962 through the same dealer, Prismagraphics; that Popovitch entered employment with Knuth in June of 1972; that the union was certified as the bargaining agent for the pressmen in July of 1973; and that

Popovitch instituted the Schlitz inquiry in April of 1974.

2. "I explained to him that I wanted to find out if we were getting the work from Schlitz because the Pressmen were organized, or if Schlitz gave their work to anybody, union, non-union, or if it didn't make any difference at all."

3. The record thus indicates that Schlitz was aware its printing work was being farmed out, but it is not shown that Schlitz was aware of

told Schmaelzle that he would not pursue the matter further.[4]

Schmaelzle also telephoned respondent's manager concerning Popovitch's call. Respondent's corporate officers were out of town on business; and the manager took no action other than to call respondent's employee relations consultant, who telephoned the facts to respondent's vice-president, Gary Knuth. Respondent's manager gave Knuth further details when he returned to town.

Knuth telephoned Schmaelzle and found him very upset. He accused Knuth of violating a trust and questioned whether Prismagraphics could continue doing business with respondent if Knuth could not control his employees. After consulting counsel, Knuth decided to discharge Popovitch.

Popovitch was summoned to Knuth's office when he reported for work. Knuth asked for an explanation, which Popovitch gave:

> I explained to Gary that I wanted to find out if we were getting work from Schlitz because—if we were getting it because the union, the Pressmen were union, or if Schlitz gave the work to anybody, if it didn't make any difference at all who they gave their work to. I wanted to be able to use that information to pass it on to the balance of the employees who were being organized, as something where they could benefit by obtaining work, not only

from Schlitz, but different union organizations.

At the end of the conversation, Knuth gave Popovitch his final paycheck, which had been prepared before Popovitch arrived.

The Union filed charges with the National Labor Relations Board on behalf of Popovitch against the respondent. A hearing was held before an Administrative Law Judge who in due course filed findings of fact and conclusions of law. The decision was reviewed by a three-member panel of the Board. A majority of the panel adopted the order of the ALJ, but added some comments of their own. The Board found that respondent had violated section 8(a)(1) of the Act. National Labor Relations Act, 29 U.S.C. § 158(a)(1). Member Kennedy dissented.[5]

An employer may not discharge an employee for engaging in activities protected under section 7 of the Act, 29 U.S.C. § 157, even though that activity causes some harm to it. *NLRB v. National Furniture Manufacturing Co., Inc.*, 315 F.2d 280 (7th Cir. 1963). Section 7, however, does not immunize an employee from discharge for acts of disloyalty or misconduct merely because those acts were associated with protected activity. *NLRB v. Electrical Workers Local 1229*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953). The Act does not interfere with the employer's normal exercise of its right to select or discharge employees, but an employer may not under the

---

the identity of the subcontractor or that it was only a partially unionized shop.

4. The ALJ, whose findings were affirmed by the majority of the Board, found that there was no evidence that Popovitch intended to damage respondent's business in any way and had he so intended "he would not so readily have volunteered not to pursue the matter further when Schmaelzle called and protested Popovitch's inquiry of his customer." A reasonable and fair inference from the record is that during the conversation with Schmaelzle the fact was brought home to Popovitch that he had unleashed a tiger if he indeed did not have that animal by its tail. We, however, for the purposes of this proceeding will assume that there was no deliberate intent on the part of Popovitch to destroy a valued business relationship of his employer.

5. The ALJ found that respondent had also violated section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), but the majority of the panel indicated that it did not need to consider this holding because of the conclusion it reached. The General Counsel's brief addressed itself to both the section 8(a)(1) and section 8(a)(3) violations, but the respondent urges that this court has no jurisdiction to consider the section 8(a)(3) holding because the Board panel did not reach it. At oral argument the General Counsel's representative indicated that he had no objection to this court striking references to the section 8(a)(3) violation in any order it entered. We therefore need not further consider the section 8(a)(3) contentions.

pretext of that right intimidate or coerce its employees with respect to their right to organize. Similarly, the Board is not entitled to use its authority as a pretext for interfering with the company's right of discharge when that right is exercised for other reasons than intimidation or coercion. *Id.* at 474, 74 S.Ct. 172. An employer may discharge an employee even for no reason at all so long as his motivation is not violative of the Act. *NLRB v. Red Top, Inc.,* 455 F.2d 721, 726 (8th Cir. 1972).

In *Electrical Workers, supra,* the Supreme Court held that an employer did not violate the Act by firing employees who distributed handbills which disparaged the quality of their employer's work but which did not refer to the underlying labor dispute. The Court indicated that there is no more elemental cause for discharge of an employee than disloyalty to his employer. *Id.* 346 U.S. at 472, 74 S.Ct. 172. In *Red Top, supra,* the Eighth Circuit held that a hospital maintenance firm did not violate the Act by discharging employees who, *inter alia,* threatened to contact the hospital which contracted with the firm regarding a labor dispute. It held that unlawful interference with an employer's commercial interests presents grounds for discharge. In *Bell Federal Savings and Loan Association v. Teamsters Local 250,* 214 NLRB No. 4 (1974), the Board held that an employer did not violate the Act by suspending a switchboard operator who informed the union of the number of times the company president talked with the company's labor counsel even though the operator had never been instructed that her work was confidential. It held that the company president had the right to expect an operator not to reveal information about telephone calls. The Board distinguished this type of information from information such as addresses of employees on time cards, which employees had a right to use for organizational purposes.

■ An employer's good faith belief that an employee has engaged in misconduct outside the protection of section 7 is not sufficient to prevent him from being held to

have violated the Act if the misconduct did not actually occur. *NLRB v. Burnip & Sims, Inc.,* 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964).

The ALJ in the present case rejected the General Counsel's contention that the reason given for Popovitch's discharge was pretextual, designed to conceal the real purpose of ridding itself of a union organizer. The ALJ found that the discharge was solely because of the inquiry made by Popovitch to the Schlitz buyer. This finding is supported by substantial evidence and is consistent with respondent's labor relations history. There is no evidence of any other unlawful conduct which would support a finding of anti-union animus. The Board does not appear to contend otherwise in this court. On the other hand, there is little doubt that Knuth knew Popovitch's organizational purpose before he decided to discharge him. At least this was a fair inference from the evidence that Popovitch had explained his purpose to Schmaelzle, who then called Knuth. The ALJ also rejected the respondent's contention that Popovitch intended to harm the company or had motives other than those which he stated.

A majority of the Board panel stated that the ALJ properly found that the respondent did not discharge Popovitch for any breach of confidentiality but discharged him because of an unfounded fear that Popovitch was attempting to initiate a secondary boycott against respondent by putting pressure on customers to send business to a union shop. The ALJ quoted a portion of Knuth's testimony:

> In our opinion, [he was] actually performing a boycott [by] asking somebody why they're buying business forms from a non-union shop . . . causing pressure on our dealer to send business to a union shop or trying to cause that pressure. And we felt . . . very strongly that if that was to happen . . . it could conceivably cost us many dollars in business . . ..

Knuth had earlier testified that the basic reason he discharged Popovitch was that he had violated a trust. It is clear from this

testimony that Knuth's use of the term "boycott" was not in a technical legal sense. He was using the term boycott to refer to what had actually been done. The ALJ later stated:

> Knuth's own testimony giving his own reasoning behind the discharge decision . . . discloses financial loss feared by him related to the possible effectiveness of what he believed to be secondary boycott action against respondent. It also reveals the real reason Popovitch was discharged.

The ALJ discounted Popovitch's violation of a confidence as a significant concern in Knuth's decision. She noted that Knuth had no specific rule against revealing information but also recognized that this is not conclusive. See *Bell Federal Savings and Loan Association v. Teamsters Local 250, supra.* She indicated the respondent's action in entertaining several dealers at the plant (at a Christmas party) detracted from its assertion that its association with one dealer must not be revealed to another. It does not, however, detract from respondent's assertion regarding the need for keeping its relations with dealers from ultimate users. Even Popovitch testified that he had never seen representatives from companies like Schlitz around the plant. The ALJ indicated that Knuth's failure to determine whether Prismagraphics actually withdrew work from respondent or determined the cause the Schlitz order was withdrawn[6] underscores the lack of significance of Popovitch's disclosure. This ignores Schmaelzle's anger, which is undisputed, and ignores the fortuitous circumstance that Schlitz was aware that its work was being subcontracted. Schmaelzle's anger was in part because Knuth could not control his employees. It cannot be determined the extent to which Knuth's discharge of Popovitch assuaged Schmaelzle's anger, but it at least demonstrated that such disclosures would not be tolerated. The standard union contract within the industry contains a provision on "Delicate Confidences," which supports respondent's contention that trust is a necessary part of the printing business, although the provision does not specifically define what constitutes a "delicate confidence." Knuth, of course, was not a party to that contract. On one other occasion Knuth accidentally revealed to an ultimate consumer that it was doing a dealer's work, and respondent never received another job from that dealer. In his final interview Popovitch admitted that he then understood that Schmaelzle was very upset and that he could have caused Knuth to lose the Prismagraphics business.

■ We hold that the findings of the ALJ and the Board are not supported by substantial evidence to the extent they indicate that Knuth was not concerned with the confidential nature of the business and to the extent they indicate that Knuth was only concerned with losing business through a secondary boycott. In so concluding we recognize the deference we must give the opinions of the ALJ and the Board. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We base our conclusion not on conflicting evidence in the record, although we have reviewed the record, but rather on the failure of the ALJ and the Board to recognize the impact of Schmaelzle's anger and the disastrous effect the revelation could have had if Schlitz had not known the work was subcontracted. These facts are undisputed and were recognized by the ALJ.

The ALJ regarded Popovitch's activities as protected because his purpose was to verify whether certain prospective campaign propaganda was truthful, a legitimate organizing activity. This analysis does not go far enough. In getting in touch with the ultimate customer, Popovitch was going well beyond the scope of his duties. Although he learned that Schlitz was the ultimate user while acting within the scope of his duties—presumably from the job ticket which accompanied the job through the plant or from the nature of the forms

---

**6.** Knuth apparently told a Board investigator that the order was withdrawn due to a paper shortage. At the hearing he could not remember the reason.

themselves—he had no authority to approach Schlitz.

Popovitch need not have revealed any information which he learned in the course of his employment to have accomplished his objective. He indicated that he did not wish to ask the Union because he felt he would get a biased opinion from it. Similarly, he did not trust his employer. Although this lack of trust may be understandable, if he had first talked to Knuth, he might have more specifically learned the harm that could result from revealing confidential information. Popovitch admitted that he knew Prismagraphics was the dealer for the order but never explained why he did not communicate with that company other than to indicate that he feared some type of bias. He could have called Schlitz and, after indicating that he was a member of the Pressmen's Union involved in an organizational campaign, asked whether, since Schlitz was an organized company, it considered whether a printer was organized in awarding work. This would not have revealed any information about respondent.

Further, the analysis of the ALJ and the Board majority is deficient in assessing the potentially denigrating impact upon his company's business, even though not intended, of the temerarious tenor of Popovitch's communication with Schlitz. It must be remembered that he did know that Schlitz was an organized plant. He wanted to ascertain whether it made any difference to Schlitz that some of their work was being done by non-union workers. The egregiousness arises from the fact that it might have made a substantial difference to a company which because of its own labor relations would want to deal only with organized plants. He did not know whether it would make a difference to Schlitz because if he had known he would not have needed to call that company. Yet he proceeded, apparently heedless of the possible consequences, to disclose to Schlitz that a printing plant doing work for Schlitz was only organized as to part of its employees and then inquired whether it made any

difference to them. Not being warned by Wisch's lack of recognition of the particular job, although he had given her his name and that of Knuth, he called back the next day to give her the specifics, the name of the business form and the dealer's name. The information sought could have been of practical help to the organizational effort only if Popovitch had been able to tell the production workers that Schlitz would prefer organized plants and that the chances of retaining the Schlitz business would be improved by voting for the union. That information, as we have pointed out, could have been sought without disclosing the identity of one in violation of the policy which Popovitch hoped would be helpful in the organizational effort.

■ In revealing the information, Popovitch acted in reckless disregard of his employer's business interests. Respondent had the right to expect its employees to use greater care in using information acquired in the course of their employment. Failure to use such care was an act of disloyalty to respondent. His avowed purpose of aiding the organizational campaign is insufficient to protect him from the effects of his misconduct and constituted cause for discharge. We agree with member Kennedy's dissenting statement:

> Since Popovitch was a pressman, he never had any excuse whatever for meddling in his Employer's dealings with its customers, and an explicit prohibition would not be necessary. Popovitch's conduct was clearly far beyond the scope of duties for which he was paid, and thus he must be held to have been aware that he was meddling in his Employer's business affairs without authorization. Therefore, Respondent was legally entitled to treat him just as it would any other employee who so seriously disrupts his employer's business.

■ Section 10(c), 29 U.S.C. § 160(c), of the Act protects the employer's right to protect its business interests and, if necessary, to discharge an employee for cause.[7]

---

7. Section 10(c) provides, in pertinent part, as follows:

No order of the Board shall require the reinstatement of any individual as an employee

Congress, while safeguarding in section 7 the right of employees to engage in concerted activities for the purpose of collective bargaining, did not intend to weaken the underlying contractual bonds and loyalties essential to a suitable employer-employee relationship. It was the purpose of the Act to strengthen, rather than weaken, the co-operation and cordial relationship between the employer and his employees.[8] The power of the Act cannot be used as a pretext for infringing the employer's rights. Since the Act was not violated, enforcement of the Board's order is denied.

ENFORCEMENT DENIED.

who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause.

8. The conference report which lead to the enactment of the Wagner Act, H.R.Rep. No. 510, 80th Cong., noted:

The Courts have firmly established that the rule that under the existing provisions of Section 7 of the National Labor Relations Act, employees are not given any right to engage in unlawful or other improper conduct.

. . . Furthermore, in Section 10(c) of the Amended Act, as proposed in the conference agreement, it is specifically provided that *no order of the Board shall require the reinstatement of any individual or the payment to him of any backpay if such individual was suspended or discharged for cause*, and this, of course, applies with equal force whether or not the acts constituting the cause for discharge were committed in connection with a concerted activity.