**ROADMASTER CORPORATION,**
Petitioner–Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,**
Respondent–Cross–Petitioner.

Nos. 88–2116, 88–2298.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1989.

Decided May 4, 1989.

Kevin J. Kinney, Krukowski & Costello, S.C., Milwaukee, Wis., for petitioner-cross-respondent.

Marilyn O'Rourke Athens, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent-cross-petitioner.

Before CUMMINGS and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

The petitioner-cross-respondent, Roadmaster Corporation ("Roadmaster"), seeks review of a National Labor Relations Board ("NLRB" or "Board") order finding Roadmaster in violation of § 8(a)(1) and (3) of the National Labor Relations Act ("NLRA"). Conversely, the respondent-cross-petitioner, the NLRB, seeks enforcement of its order. In its order, the NLRB determined that Roadmaster had discharged an employee, John David Gardner, for his union activities and not for his alleged violation of a company rule. It further determined that even if Roadmaster had fired Gardner for violating a company rule, he was still discharged for engaging in protected concerted activity. Therefore, the NLRB ordered Roadmaster to cease and desist from engaging in unfair labor practices, to reinstate Gardner with full back pay and seniority rights, and to post remedial notices. On appeal, Roadmaster makes three contentions. First, Roadmaster argues that the General Counsel failed to meet its prima facie burden of showing antiunion animus. Second, Roadmaster contends that it would have discharged Gardner regardless of any antiunion animus that may have existed. Finally, Roadmaster argues that the NLRB erred in finding that it discharged Gardner for engaging in protected concerted activity. For the reasons set forth below, we uphold the NLRB's determination that Roadmaster discharged Gardner for engaging in protected concerted activity. Therefore, without reaching the other two issues on ap-

peal, we grant the NLRB's application for enforcement and deny Roadmaster's petition for review.

## I

Roadmaster manufactures bicycles, tricycles, and other riding toys at its Olney, Illinois plant. Roadmaster's employees were originally represented by the United Employees Union ("UEU"), which had entered into a collective bargaining agreement with Roadmaster that was in effect from December 1, 1982, until February 28, 1986. In August 1985, however, Roadmaster's employees changed their union affiliation from the UEU to the Production and Maintenance Employees' Local 504, Laborers' International Union of North America ("Union"). At first, Roadmaster refused to recognize the Union or to process grievances under the Roadmaster–UEU collective bargaining agreement. But on March 1, 1986, Roadmaster offered to meet with the Union and negotiate a new collective bargaining agreement. Although the parties negotiated, they failed to reach an accord.

Thus, on March 31, 1986, Roadmaster unilaterally implemented its final proposal. The implemented proposal slightly modified the multi-step grievance procedure that existed under the UEU–Roadmaster collective bargaining agreement. Under step one, the employee had to meet with the supervisor involved and present his grievance verbally within three days of the disputed action.[1] The supervisor would then give the employee a verbal response at this meeting, or if more information was necessary, within one day. Under step two, if the grievance was not settled at the step one meeting, the employee had to present his grievance to the supervisor in writing, which was signed by the employee.[2] A meeting would then be held at which the employee, the supervisor, and representatives of both the Union and Roadmaster would be present. Roadmaster would then send the Union's president a written response to the grievance. Under step three, the Union could present the grievance to the Labor Relations Assistant at Roadmaster, and the grievance would be discussed at another Union–Roadmaster meeting. Finally, under step four, the grievance could be submitted to arbitration.

John David Gardner was the secretary-treasurer of the Union and a member of its executive board. One of his duties was to process grievances on behalf of Union members. In early 1985, Gardner sent a letter on UEU letterhead to the Federal Trade Commission ("FTC"), confirming an earlier phone call, in which he advised the FTC that Roadmaster may have been mislabeling its bicycles to make them appear as if they were manufactured domestically, instead of in Taiwan. Subsequently, another UEU member sent the FTC a similar letter which also alerted the FTC to potential safety problems with some of the imported bicycles from Taiwan. In September 1986, two newspapers, one in Olney, Illinois and the other in Evansville, Indiana, ran an article on this mislabeling controversy. Both articles referred to Gardner's letter as prompting an FTC investigation.

On September 25, 1986, Gardner, along with other Union representatives, attended a regularly scheduled meeting with representatives from Roadmaster. After reviewing the agenda, the Union's president, Terry Groves, asked why other items were not on the agenda. Roadmaster's plant superintendent, Howard Atkison, responded, "Well it seems like every time we say anything to you it appears on the Press [sic] or on television." Tr. at 81.

After the meeting, some reporters from a television station in Terre Haute, Indiana interviewed Gardner about the bicycle mislabeling controversy. His interview was shown that same evening. The next day, Gardner's supervisor told him that he had seen the broadcast. Additionally, at a meeting of Roadmaster's management, a

---

**1.** Under the expired UEU–Roadmaster collective bargaining agreement, the employee had four days to present his grievance to the supervisor involved.

**2.** Under the UEU–Roadmaster collective bargaining agreement, the employee did not have to sign the written grievance.

videotape of Gardner's interview was shown. After the tape had been played, Roadmaster's president, George Nebel, stated that Gardner "was like a cancer." *Id.* at 20.

On October 6, 1986, shortly after Roadmaster became aware of Gardner's involvement in the bicycle mislabeling controversy, Gardner received a telephone call from Dennis Bishop, an ex-employee of Roadmaster. Roadmaster had discharged Bishop, and he was seeking assistance in getting reinstated. Gardner advised him to talk with his supervisor, which is required under step one of the multi-step grievance procedure. At this time, they did not discuss the possibility of filing a written grievance as required by step two.

That same evening, Gardner tried to speak with Bishop but he was not at home. The next day, Gardner again was unsuccessful in contacting Bishop. Gardner then decided to prepare a grievance and sign Bishop's name to it because he was worried that this grievance would be rejected by Roadmaster as being untimely and that the Union could possibly be sued for violating its duty of fair representation.[3] On October 8, 1986, Gardner filed Bishop's grievance with Roadmaster.

On October 14, 1986, Kathy Copper, the Labor Relations Assistant at Roadmaster, and foreman Russell Gentry informed Atkison that there was a problem with Bishop's grievance because Bishop did not know a grievance had been filed on his behalf nor did he authorize anyone to sign one for him. The next day Gardner was asked to report to Copper's office. Present at this meeting were Copper, Gentry, and Atkison. Gardner readily admitted that he had signed Bishop's name to the grievance and told them why. Gardner also acknowledged that he should have indicated on the written grievance that he was signing it for Bishop. Both Groves and Bishop were subsequently called into the meeting. Bishop

stated that he had not authorized Gardner to file or sign a grievance on his behalf. Atkison then suspended Gardner pending further investigation. Roadmaster, however, reinstated Bishop as an employee the next day.

Following the meeting, Atkison asked Copper to pull the grievance files for 1986. An inspection of these files showed that on two other grievances Gardner had signed the names of employees and susupervisors. On October 20, 1986, Gardner filed a grievance over his suspension and a second step meeting was held three days later. At the meeting, Atkison asked Gardner whether he had signed the employees' and supervisors' names on the two other grievances. Gardner refused to answer the question on the advice of counsel. Atkison stated that once an employee filed a grievance it became a company document, and therefore, Gardner had violated the company's rule against falsifying company records by signing the names of other individuals on written grievances.

On October 28, 1986, Atkison hand-delivered a termination letter to Gardner. The letter stated that Gardner was being discharged for violating the company's rule against falsifying company records. Two months later, Roadmaster sent its employees a holiday greeting in which it referred to "distorted and harmful campaigns in local newspapers and in prompted government investigations." General Counsel's Exhibit No. 20.

## II

Roadmaster has consistently argued that it discharged Gardner solely for violating the company's rule against falsifying company records. The NLRB, however, determined that Roadmaster committed an unfair labor practice by discharging Gardner in violation of § 8(a)(1) and (3) of the NLRA. 29 U.S.C. § 158(a)(1), (3). It ruled

---

**3.** All unions have a duty to "represent fairly the interests of all bargaining-unit members during the negotiation, administration, and enforcement of collective-bargaining agreements." *International Bhd. of Elec. Workers v. Foust,* 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698

(1979); *see also NLRB v. Local 139, Int'l Union of Operating Eng'rs.,* 796 F.2d 985, 992–93 (7th Cir.1986) (stating that the union must serve the interests of all members in negotiating and administering a collective bargaining agreement).

that Roadmaster's alleged reason for the discharge was a mere pretext and that Roadmaster actually fired Gardner because of his involvement in the bicycle mislabeling controversy. The Board further ruled that even if Roadmaster had discharged Gardner for signing the names of other individuals on written grievances, his actions were protected concerted activity under the NLRA. We must uphold the Board's finding of an unfair labor practice so long as it is "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e); *see Local 1384, UAW v. NLRB*, 756 F.2d 482, 486 (7th Cir.1985); *NLRB v. Town & Country LP Gas Serv. Co.*, 687 F.2d 187, 190 (7th Cir.1982); *Dreis & Krump Mfg. Co. v. NLRB*, 544 F.2d 320, 325 (7th Cir.1976). We consider substantial evidence to be "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *accord NLRB v. Del Rey Tortilleria, Inc.*, 787 F.2d 1118, 1121 (7th Cir.1986).

We turn first to the NLRB's determination that even if Roadmaster terminated Gardner for violating a company rule, it still discharged Gardner for engaging in protected concerted activity. Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in *other concerted activities* for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. § 157. The NLRA makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their § 7 rights. *Id.* § 158(a)(1). To further protect employees engaging in protected concerted activity under § 7, the NLRA also makes it an unfair labor practice for an employer to encourage or discourage membership in a labor organization by discriminating in regard to hire or tenure of employment. *Id.* § 158(a)(3).

■ Of course, § 7 does not protect all concerted activities. *E.g., NLRB v. City Disposal Sys.*, 465 U.S. 822, 837, 104 S.Ct. 1505, 1514, 79 L.Ed.2d 839 (1984); *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962); *Texas Instruments, Inc. v. NLRB*, 637 F.2d 822, 830 (1st Cir.1981). If an employee engages in indefensible or abusive conduct, his otherwise concerted activity will lose the protection of § 7. *See, e.g., City Disposal*, 465 U.S. at 837, 104 S.Ct. at 1514; *Washington Aluminum*, 370 U.S. at 17, 82 S.Ct. at 1104; *NLRB v. Knuth Bros., Inc.*, 537 F.2d 950, 953 (7th Cir.1976). Whether an employee's concerted activity remains under the protection of § 7 depends on the facts of each particular case. *See NLRB v. Florida Medical Center, Inc.*, 576 F.2d 666, 673 (5th Cir.1978). In the first instance, the task of determining whether an employee's concerted activity remains under the protection of § 7 is for the Board to perform. *See City Disposal*, 465 U.S. at 829, 104 S.Ct. at 1510; *Dreis & Krump*, 544 F.2d at 329. Our court will uphold the Board's determination in this regard so long as it is not illogical or arbitrary. *United States Postal Serv. v. NLRB*, 652 F.2d 409, 412 (5th Cir. Unit A July 1981); *Dreis & Krump*, 544 F.2d at 329; *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir.1965).

■ It is well settled that the filing of grievances pursuant to a collective bargaining agreement is protected concerted activity under § 7. *E.g., City Disposal*, 465 U.S. at 836, 104 S.Ct. at 1513; *Town & Country*, 687 F.2d at 191; *Ad Art, Inc. v. NLRB*, 645 F.2d 669, 678 (9th Cir.1981). Naturally, this protection extends to a union steward or official who aids another employee in filing a grievance. *Caterpillar Tractor Co. v. NLRB*, 638 F.2d 140, 141 (9th Cir.1981). Therefore, the issue before us is whether Gardner's filing of grievances became *unprotected* concerted activity because he signed the names of other individuals on them. The NLRB determined that Gardner's actions remained protected concerted activity, and we uphold that determination.

We note that Gardner signed Bishop's name to his grievance for two reasons: (1) to make sure that he timely filed the signed written grievance in accordance with the collective bargaining agreement; and (2) to protect the Union from potential liability arising from its duty of fair representation.[4] *See* Tr. at 46 ("Because I wanted to protect his rights under the grievance procedure and to protect the Union from a lawsuit."). Gardner testified that he was particularly concerned with filing the grievance on time because he had filed two previous grievances on behalf of other employees which Roadmaster rejected as untimely. *Id.* at 45. Both rejected grievances had been filed after Roadmaster had implemented its final proposal and shortened the time in which to present grievances. The motive of an employee is relevant in determining whether he engaged in protected concerted activity. *See NLRB v. Red Top, Inc.*, 455 F.2d 721, 725–26 (8th Cir.1972). In this regard, Gardner acted in good faith and for legitimate reasons.

We also note that Gardner did not try to deceive Roadmaster by signing Bishop's name. Gardner had originally tried to contact Bishop before he filed Bishop's grievance, but was unsuccessful. Moreover, when Atkison first confronted Gardner about the Bishop grievance, Gardner readily admitted that he had signed Bishop's name and that he should have indicated on the grievance that he was signing it for Bishop. *See* ALJ's Decision, at 6–7. Indeed, it would have been impossible for Gardner to deceive Roadmaster, even if he wanted to. At step two of the grievance procedure, a meeting would be held at which both the supervisor and the individual grievant would be present. General Counsel's Exhibit No. 3. Thus, at this meeting Roadmaster would surely have found out that Bishop did not sign the written grievance himself.

Roadmaster relies on various cases for the proposition that it has the right to discipline an employee for dishonesty or untruthfulness. These cases, however, involved an intent to deceive the employer coupled with the potential for personal gain. *See, e.g., NLRB v. Ryder/P.I.E. Nationwide, Inc.*, 810 F.2d 502, 504–05 (5th Cir.1987) (employer discharged employee for falsifying his timecard); *Airborne Freight Corp. v. NLRB*, 728 F.2d 357, 358 (6th Cir.1984) (same); *Firestone Tire & Rubber Co. v. NLRB*, 539 F.2d 1335, 1336 (4th Cir.1976) (employer discharged employee for falsifying his employment application). Thus, these cases are distinguishable from the one before us because Roadmaster has failed to produce any evidence that Gardner intended to deceive the company or that he personally could have benefited in any way by deceiving the company.

Roadmaster also argues that the signing of Bishop's name was not an isolated occurrence. On two prior occasions, Gardner had signed the names of employees and supervisors on written grievances to show that step 1 of the grievance procedure had been fulfilled. *See* ALJ's Decision, at 9. Gardner, however, signed the names of other individuals to these two grievances in order to protect the employees' rights by preserving the grievances for future resolution. As the ALJ noted, "Gardner credibly testified that he signed the supervisors' names because, at the time the grievances were filed, [Roadmaster] did not recognize the Union and no step 2 grievance meetings were being held." *Id.* Thus, as with the Bishop grievance, Gardner was not trying to deceive Roadmaster, and he could not have profited personally by deceiving the company. Therefore, under the facts of this particular case, we cannot say that the Board's determination that Gardner's actions were protected concerted activity un-

---

**4.** Of course, the only evidence establishing why Gardner signed Bishop's name to the grievance was his own testimony. The ALJ, however, found Gardner to be a "highly credible witness," and she accepted and credited his testimony as truthful. ALJ's Decision, at 3 n. 3. The NLRB accepted the ALJ's credibility determinations and findings. *See* NLRB's Decision and Order, at 2 n. 2. Unless exceptional circumstances are shown, our court must accept the credibility findings of the ALJ and the Board. *Del Rey Tortilleria*, 787 F.2d at 1121; *NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 622 (7th Cir.1981).

der § 7 is illogical or arbitrary.[5]

As the Supreme Court has noted, under § 8(a)(1) and (3), "it is undisputed that if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, ... the employer commits an unfair labor practice." *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 398, 103 S.Ct. 2469, 2472, 76 L.Ed.2d 667 (1983). Roadmaster has consistently articulated only one reason for discharging Gardner—that he violated the company's rule against falsifying company documents by signing the names of other individuals to grievances. Because we have upheld the Board's determination that this was protected concerted activity, Roadmaster discharged Gardner solely for engaging in union activities. Therefore, we hold that substantial evidence supports the Board's determination that Roadmaster commited an unfair labor practice by discharging Gardner. Since we affirm the Board's ruling that Roadmaster discharged Gardner for engaging in protected concerted activity, we do not need to reach the other two issues on appeal.

### III

For all the foregoing reasons, we GRANT the Board's application for enforcement and DENY Roadmaster's petition for review.

***

**5.** Although Roadmaster claims it fired Gardner for violating its rule against falsifying company documents, it is not at all apparent that Gardner even violated the rule. Bishop's grievance was written on the Union's stationary. Additionally, Roadmaster had never previously claimed that grievances were company documents. In any event, we need not determine whether Gardner actually violated the company's rule because his activity was protected, regardless of the rule. Moreover, even if Roadmaster had believed in good faith that Gardner violated the company's rule and acted outside the protection of § 7, this would not be enough to prevent its discharge of Gardner from being an unfair labor practice. *See Knuth Bros.*, 537 F.2d at 954.