*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0124p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

OPW FUELING COMPONENTS,
                    *Petitioner/Cross-Respondent,*

            *v.*

NATIONAL LABOR RELATIONS BOARD,
                    *Respondent/Cross-Petitioner.*

Nos. 04-2563; 05-1083

>

On Petition for Review and Cross-Application for Enforcement
of a Decision of the National Labor Relations Board - Region 9.
No. 9-CA-40071.

Argued: November 28, 2005

Decided and Filed: April 6, 2006

Before: SILER and GRIFFIN, Circuit Judges; COOK, District Judge.[*]

---

## COUNSEL

**ARGUED:** Michael W. Hawkins, DINSMORE & SHOHL, Cincinnati, Ohio, for Petitioner. Heather S. Beard, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. **ON BRIEF:** Michael W. Hawkins, Colleen P. Lewis, DINSMORE & SHOHL, Cincinnati, Ohio, for Petitioner. Heather S. Beard, Aileen A. Armstrong, Jill A. Griffin, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

---

## OPINION

---

COOK, District Judge. This appeal involves a petition for the review of a final administrative decision by the National Labor Relations Board – Region 9 ("NLRB"). In this case, the Petitioner and Cross-Respondent, OPW Fueling Components ("OPW-FC" or "Company"), appeals an order by the NLRB on December 16, 2004, which determined that the discharge of a former employee, Logan Cox, was in violation of sections 8(a)(1), (3), and (4) of the National Labor Relations Act ("NLRA" or "Act"). *See* 29 U.S.C. §§ 158(a)(1), (3), and (4).

---

[*] The Honorable Julian Abele Cook, Jr., United States District Judge for the Eastern District of Michigan, sitting by designation.

I.

There are two corporations involved in this litigation. The first corporation, the OPW-FC, manufactures gas nozzles for use in service stations. The OPW-FC's sister corporation, the OPW Engineered Systems ("OPW-ES"), manufactures and sells liquid handling equipment, such as truck and railcar loading arms. The employees of these two corporations are represented by the Glass, Molders, Pottery & Plastic Allied International Union whose collective bargaining relationship with management dates back to the early 1960s.

Logan Cox had worked for the OPW-FC for twenty-eight years until his discharge from the Company in November 2002. During his employment, he was represented by the Union and served as its union steward and as a bargaining committeeman. In his capacity as a bargaining committeeman, Cox assisted the Union in its negotiations with the Company which resulted in the formation of a new collective bargaining agreement on September 16, 2002. He was also responsible for the filing and the processing of grievances, as well as participating in all of the "third step" stage grievance hearings. Apart from one minor work-related incident (i.e., an unauthorized absence from work violation in 1979), for which he received a verbal warning, Cox maintained a positive relationship with his employer. On September 24, 2002, less than two weeks after the parties' new collective bargaining agreement became effective, Cox, acting on behalf of the Union, filed an unfair labor practice charge with the NLRB which accused the OPW-FC of unilaterally changing its practice and policy for compensating those employees who perform union business on company time. The matter was subsequently settled between the parties without any official action by the NLRB.

Approximately three weeks later (October 15, 2002), Thomas Ciepichal, the OPW-FC's vice-president of operations, and David Orewiler, its human resource director, met with Cox and other union representatives, including Raymond Mann, the Union's bargaining committee chairperson, to discuss the recall status of fourteen employees who had been laid off or transferred in May 2002. However, during these discussions with management at this meeting, Mann and Cox openly expressed their differences of opinion over the recall rights provision in the collective bargaining agreement. It was Mann's view that this recall provision should be interpreted so as to give priority to those employees who had been laid off in May 2002 over their fellow workers who had been transferred to the OPW-ES. On the other hand, Cox took the position that the collective bargaining agreement required the Company to give priority of recall to the fourteen employees on the basis of their rights of seniority. Cox, with recognition that he and Mann had a genuine disagreement over the interpretation of the recall provision in the collective bargaining agreement, advised Orewiler, among other things, that it was imperative that the International Union be given a reasonable amount of time in which to evaluate this issue. The Company agreed. However, two days later (October 17, 2002), and without waiting for a response from the International Union, the OPW-FC announced that it would recall the laid off workers and, in turn, would not give recognition to the seniority rights of those employees who had been subject to its transfer directive in May 2002.

Believing that the Company had (1) broken its verbal commitment to wait for a reasonable period of time in which to receive an interpretation of the challenged provision from the International Union and (2) violated the terms of the collective bargaining agreement, Cox and Mann discussed the merit of filing a grievance against the OPW-FC. On October 23, 2002, the last day on which a timely grievance could be filed under the terms of the collective bargaining agreement, Mann authorized Cox to file a grievance. Armed with this authorization, Cox, with the drafting assistance of a union steward, Denny Brock, prepared a grievance form that would challenge the Company's decision to disregard the existing seniority rights of those employees who had been laid off in May 2002.

After Brock had finished writing the text of the grievance, Cox completed the balance of the form by identifying "Local 45-B" as the "Grievant" and listing other requisite information.[1] As a supplement to text, Cox affixed the names and the signatures of two of the involuntarily transferred employees (Larry Grace and Kenny Miller) above the line marked "Aggrieved Employee" without seeking or acquiring their permission. He also signed his name over the line marked "Union Official." Edwin Chaney, a union committeeman, acting upon Cox's request, signed the grievance as the second union official.[2]

After completing the grievance form, Cox gave it to his supervisor, who, in turn, placed it on the desk of her supervisor, Ronnie Tolliver. When Tolliver arrived at work on the following morning (October 24, 2002), he was surprised to see the signatures of Grace and Miller on the grievance form because it was "basic shop knowledge" that both of these workers were quite content at the OPW-ES. Tolliver took the grievance form to Orewiler who, in turn, contacted Mary Hedge, the OPW-ES's human resource director. She, along with Mann, talked to Grace and Miller, both of whom denied having given Cox any authority to place their names on the grievance form. Thereafter, Mann recommended to Cox that the names of these two workers be removed and replaced with "Local 45-B" as the aggrieved employee. Cox complied with his suggestion.

At a later time on the same day, Cox asked Orewiler's assistant, Melissa Wolff, to accept this modified version of the grievance form as a replacement of the original document. She declined to do so and referred him to Orewiler, to whom he sought to explain the situation.[3] Cox, who had never denied having signed the names of Grace and Miller to the grievance form, was suspended pending an investigation by the Company. On the same day, a member of the OPW-FC staff spoke with Chaney, who denied having affixed the names of Grace and Miller to the grievance form. In a letter on November 8, 2002, the OPW-FC officially terminated Cox, citing his alleged violation of the Company's Code of Conduct and plant rules relating to the falsification of records.[4]

Cox challenged his discharge, and, during the "third step" grievance meeting in mid-December 2002,[5] Orewiler commented that "we need to settle this thing. But you have already made Mr. Ropp mad with the little thing at the Labor Board." (J.A. at 17.)

---

[1] The information that was supplied by Cox included such things as the plant location, grievance number, date of the violation, date on which the grievance was filed, as well as an identification of the article, section, and page number of the collective bargaining agreement that was allegedly violated.

[2] Chaney maintains that he was unaware that the Grace and Miller had not signed the grievance.

[3] According to Cox, he stated that "[t]hese guys are raising hell about their names being on the grievance. So I took their names off, put '45B' on, and I would like the grievance processed. The initial body of the grievance has not changed and it needs to be processed." Orewiler purportedly responded by saying that "[t]his is highly unusual. And I'm not too happy with the way things are going here. I am going to speak to your chairman, Raymond Mann, and see what can be done about your activity."

[4] The only other unknown fact that was uncovered during this investigation related to Chaney's lack of involvement in the unauthorized inclusion of the two employees, Grace and Miller. Thus, it appears that the OPW-FC utilized October 28th through November 8th in an effort to ascertain the Company's past disciplinary practices in similar incidents. The research by the Company resulted in the identification of only one incident in which an employee with six years of seniority was discharged for "Falsification of FMLA Medical documentation submitted.."

[5] The OPW-FC was represented by Orewiler and Ciepichal at this meeting. The Union was represented by Mann, Chaney, Jim Miller, a union committeeman, and Wesley Royster, a representative of the International Union.

During a meeting in the early part of January 2003 between management and the Union about a matter that is unrelated to this controversy,[6] Ciepichal proclaimed the Union "had already made Mr. Ropp mad with [its] charges at the Labor Board." *Id.* He also warned the Union that "if [it] didn't find some way of working together [with the Company] there could be a possibility that more work would be moved out, and maybe the whole plant."[7] *Id.*

Shortly thereafter, the Union filed an unfair labor practice charge against the Company, alleging that the termination of Cox was an act of retaliation for his filings of (1) the September 24, 2002 unfair labor practice charge and (2) the recall-rights grievance form. The Union also charged the OPW-FC with having "threatened employees that if [they] continued filing charges with the NLRB, [the Company] would not bring work back into the plant." (J.A. at 294.) Administrative Law Judge John T. Clark agreed with the Union. The OPW-FC appealed. On December 16, 2004, the NLRB adopted his ruling, findings and conclusions of law on all grounds, finding that the OPW-FC had violated sections 8(a)(1), (3), and (4) of the NLRA. An appeal by the Company to this Court followed.

II.

In essence, the OPW-FC asserts that (1) the findings of fact by the NLRB are not supported by substantial evidence, and (2) the NLRB's application of *Roadmaster v. NLRB*, 288 NLRB 1195 (1988), *enfd.* 874 F.2d 448, 452 (7th Cir. 1989), to this case is misplaced. We address each of these arguments in turn.

## A. The Board's Findings

### 1. Standard of Review

In its position as the Petitioner in this litigation, the OPW-FC carries the burden of persuading this Court that the findings of fact by the NLRB are not supported by "substantial evidence." 29 U.S.C. 160(e) ("The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."). In interpreting this phrase, the Supreme Court has held that substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation marks and citation omitted).

This Court has given, and will continue to give, significant deference and weight to the findings of fact by the Board and its "application of the law to the facts." *NLRB v. Ohio Masonic Home*, 892 F.2d 449, 451 (6th Cir. 1989). Moreover, "we are not free to substitute our judgment for that of the Board simply because we would have made a different decision had we heard the case *de novo* . . . ." *NLRB v. Pipefitters Union Local No. 120*, 719 F.2d 178, 181 (6th Cir. 1983). Other circuits have held that the Board's determination that an employee's conduct remains protected under the Act would be upheld "so long as it is not illogical or arbitrary." *See, e.g.*, *Roadmaster*, 874 F.2d at 452. Nevertheless, as the Supreme Court declared in *Universal Camera Corp.*, "[t]he Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." 340 U.S. at 490.

---

[6]During this meeting, the OPW-FC was represented by company officials Ciepichal, Orewiler, James Gregory Pierson, and Tolliver. The Union was represented by bargaining committee members Mann, Miller, Chaney, Larry Perkins, and Ralph Roche.

[7]Ciepichal denies having made the statements which were attributed to him by Mann.

Therefore, we must decide whether there is substantial evidence to support the Board's findings that (1) the conduct of Cox under these circumstances is a "protected activity" under Section 7 of the Act; (2) the OPW-FC terminated him on the basis of an improper motivation (i.e., anti-union animus); and (3) the Union was threatened by the Company during the January 6, 2003 meeting.

### a. Cox's Conduct is Protected Activity Under Section 7 of the Act

Section 7 of the Act provides a guarantee to employees that they have a "right to self-organization, to form, join, or assist labor organizations, . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157. This Act protects these rights by prohibiting employers from engaging in "unfair labor practices." Moreover, the Act defines "unfair labor practices," in relevant part, as "discrimination in regard to . . . any term or condition of employment to encourage or discourage membership in any labor organization," *id.* § 158(a)(3), and as a "discharge or otherwise discriminat[ion] against an employee because he has filed charges . . . ," *id.* § 158(a)(4). More generally, an unfair labor practice is any activity that "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of the rights guaranteed in section 157 . . . ." *Id.* § 158(a)(1).

Filing a grievance is a protected activity under Section 7 of the Act. *See NLRB v. City Disposal Systems*, 465 U.S. 822, 836 (1984). "Naturally, this protection extends to a union steward or official who aids another employee in filing a grievance." *Roadmaster*, 874 F.2d at 452. However, "[i]f an employee engages in indefensible or abusive conduct, his otherwise concerted activity will lose its protection [under the Act]." *Id.* Therefore, as in *Roadmaster*, the issue here is whether Cox's "filing of grievance[] became *unprotected* concerted activity because he signed the names of other individuals on [it]." *Id.* (emphasis in original).

As noted in *Roadmaster*, "[t]he motive of an employee is relevant in determining whether he engaged in protected concerted activity." *Id.* at 453. The facts surrounding *Roadmaster* are nearly identical to the facts in the appeal before this Court. The *Roadmaster* court held that the union steward's conduct did not constitute forgery and, therefore, was a "protected concerted activity" under the Act because he (1) acted in good faith and for legitimate reasons and (2) did not have an intent to deceive his employer.

Here, Judge Clark found, and the Board affirmed, that Cox was acting in good faith and for a legitimate reason, which was "to preserve the Union's right to pursue what he believed was the correct interpretation of the recall provision in the collective-bargaining agreement." (J.A. at 4.) Cox's good faith conduct was demonstrated by the absence of evidence that he "would [have] . . . profit[ed] or gain[ed] anything from deceiving [the OPW-FC]." *Id.* Furthermore, the administrative law judge determined, and the Board also affirmed, that Cox had no intent to deceive his employer. Judge Clark reasoned that

> no union official, especially not one as experienced as Cox, could possibly think that such a blatant deception could achieve any objective. Under the very best scenario the ruse would be discovered when the employees were told to return to their former positions, and the chance of the deception progressing that far is slight, if at all. Management knew that the employees did not want to return to OPW-FC, and Cox made it clear to Orewiler that he would file a grievance if the recall was not corrected or if the Union was not allowed time to obtain input from the International. If his intent was to deceive, it is doubtful that he would give advanced notice of the deception, nor is there evidence that anyone was either deceived or harmed by his action.

*Id.*

In *NLRB v. Aquatech, Inc.*, we held that the function of the Board is "to resolve questions of fact and credibility, and this court ordinarily will not disturb credibility evaluations of the Board or an administrative law judge who has observed the witnesses' demeanor." 926 F.2d 538, 544 (6th Cir. 1991). Therefore, in light of Judge Clark's rationale as well as the limited standard of review of this Court, we conclude that the findings of the Board are supported by substantial evidence on the record as whole.

Notwithstanding, the OPW-FC urges this Court to find that the conduct of Cox is not protected by the rationale of *Roadmaster* because of his intent to deceive the Company. Foremost, the OPW-FC points out that

> Cox did not attempt to consult with Grace and Miller, nor did he seek to obtain permission to sign their names, despite having sufficient time to do so. . . . The clear implication is that Cox actively concealed his intentions from Grace and Miller because he, as did everyone else, knew that they were happy at OPW ES, and would never sign or consent to [the] grievance . . . .

Pet'r./Cross-Resp't's Br. at 25. However, three observations run counter to the OPW-FC's argument. First and foremost, the Company and the Union knew that Grace and Miller were content with their work environment at the OPW-ES. Thus, given the well known satisfaction of these two workers, it is doubtful that Cox possessed a belief that he could deceive anyone at the OPW-FC into believing otherwise by signing their names on the grievance form. Furthermore, there is no evidence that the signatures of these two employees were necessary in order for the Union to challenge the Company's recall decision. Hence, it seems unlikely that Cox would have risked his credibility as a union official and a twenty-eight-year employee to deceive the Company without any personal gain to him or the Union. Finally, notwithstanding the OPW-FC's contention, Cox did not have a sufficient amount of time in which to approach Grace and Miller for their signatures. Under the circumstances of this case and according to the terms of the collective bargaining agreement, the Union had a limited amount of time in which to file a grievance claim. While Cox waited for a response from the International Union, he was not given permission to file a grievance until the 23rd of October when Mann gave him authority to do so.

Next, the OPW-FC argues that Cox's intent to deceive is demonstrated by the fact that he signed the names of Grace and Miller in different styles and with different pens in an effort to induce the "eventual reader of the grievance that it was genuinely prepared by . . . [each of them]." Pet'r./Cross-Resp't's Br. at 28. Although the Board did not specifically address this issue, the Company's argument must be rejected for same reasons that have been noted above; namely, the facts in this case strongly suggest that it is extremely doubtful that Cox intended to deceive the OPW-FC's management. Furthermore, even if we were of the opinion that these facts demonstrate Cox's intent to deceive, the view of this Court would not warrant the disturbance of the NLRB's contrary—but otherwise reasonable—conclusion. *See Universal Camera Corp.*, 340 U.S. at 477.

Nonetheless, the OPW-FC contends that the behavior of Cox after his initial filing of the recall-rights grievance form clearly demonstrates an intent by him to deceive. The Company points to Cox's contact with Orewiler's assistant which, in its opinion, represents a blatant attempt "to process the modified grievance and reacquire the forged one." Pet'r/Cross-Resp't's Br. at 28. The Board did not consider this fact to be significant enough to address it. As a postscript, the Court notes with interest that it was Mann, the Union official, who instructed Cox to "white out" the names of Grace and Miller and insert "Local 45-B" as the aggrieved employee.

**b. The OPW-FC Terminated Cox Based on an Improper Motivation**

The Board also adopted Judge Clark's conclusion that Cox's wrongful termination was motivated by his filing of the grievances, in violation of Section 8(a)(1), (3) and (4). Accordingly, the burden shifts to the OPW-FC to "demonstrate that the adverse action would have taken place even in the absence of the protected conduct." *NLRB v. Talsol Corp.*, 155 F.3d 785, 797 (6th Cir. 1998) (quoting *NLRB v. E.I. DuPont De Nemours*, 750 F.2d 524, 529 (6th Cir. 1984)) (internal quotation marks omitted).

Here, the OPW-FC contends that Cox was fired because he falsified a "company document." However, Judge Clark found (and the Board concurred) that the OPW-FC's proffered reason was simply a pretext for its anti-union animus. In making his finding, Judge Clark gave significant weight to (1) the disproportionate punishment that Cox, who had been given only one verbal warning for an unauthorized absence from work during his twenty-eight years of employment with the Company, received for a relatively insubstantial and easily correctable "mistake"; (2) the coincidental timing of the grievance filings of Cox and his subsequent discharge; and (3) the credibility of Mann's testimony regarding the comments by the OPW-FC during the meetings in December 2002 and January 2003.[8] In noting that an employer's actual motivation may be shown through circumstantial evidence, *see Talsol Corp.*, 155 F.3d at 798, and given our limited standard of review, we find that the Board's determination (i.e., the OPW-FC's proffered justification was a pretext) is supported by substantial evidence.

Moreover, Judge Clark notably did not categorize the grievance form as a "company document." He correctly found that "Article 14, section 3, step 1, of the collective-bargaining agreement . . . states that once a grievance is reduced to writing the grievance becomes the property of the union bargaining committee." (J.A. at 17) Therefore, the OPW-FC's contention on this issue is without merit.

The OPW-FC also attempts to justify the discharge of Cox on the basis of its earlier termination of another employee who had falsified medical documents. In rejecting this comparison, Judge Clark quoted from *Roadmaster*:

"Gardner's [the discharged union officer] signing of other individuals' names to grievance forms is distinguishable from the falsification of medical excuses, . . . offenses that the Respondent had used as a basis for discharge of employees in prior years. Gardner's actions . . . merely initiated a procedure through which personnel decisions would later be determined. He derived no personal benefit from his conduct; nor did it in itself have any substantive consequence. By contrast, the falsification of medical excuses, employment applications, or other personnel records affect the substantive aspect to employee-employer relationship because the Respondent may rely on this information in making personnel decisions about the individuals in question."

(J.A. at 17) (quoting *Roadmaster*, 288 NLRB at 1196) (alterations in original). Judge Clark concluded, and we agree, that "[t]he identical statement can be made about the [OPW-FC's] contention in this case." *Id.*

---

[8] The Board accepted the determination by the Judge Clark that the witnesses whose testimony ran counter to Mann were not credible because they were untruthful given their "demeanor when testifying." (J.A. at 18.)

### c. The OPW-FC Threaten the Union in Violation of Sections 8(a)(1) and (4)

Moreover, the Company challenges the Board's adoption of Judge Clark's finding that the OPW-FC threatened the Union during a meeting in January 2003 in violation of Section 8(a)(1) when Ciepichal stated, "if we didn't find some way of working together there could be a possibility that more work would be moved out, and maybe the whole plant." (J.A. at 17.) In making this finding, Judge Clark found Mann's testimony to be credible, notwithstanding Ciepichal's denial. He further took account of the "personal interests of each witness in the outcome of the case," noting that "it [was] Cox who disagreed with Mann, and Mann testified that he told Cox, after the fact, that he should not have put the names of the employees on the grievance." (J.A. at 18.) Judge Clark also observed that "[Mann's] demeanor [is] . . . that of a reliable and trustworthy witness, who was striving to tell the truth to the best of his ability." *Id.* Although Larry Perkins, another union official who attended the January 2003 meeting, denies having heard Ciepichal make the threat, Judge Clark concluded that Perkins' testimony was not believable. (J.A. at 18.) The Board adopted Judge Clark's observations.

Nevertheless, the OPW-FC argues that the Board erred when it considered the uncorroborated nature of Mann's testimony. In support of this position, it points to *NLRB v. Okun Bros. Shoes Store, Inc.*, as stating, "[n]ormally the uncorroborated testimony of an interested party does not amount to substantial evidence of an unfair labor practice." 825 F.2d 102, 106 (6th Cir. 1987). However, the OPW-FC has not shown that Mann is an "interested party" to this litigation. In fact, it was Mann's interpretation of the collective bargaining agreement that was challenged by Cox.

Finally, the OPW-FC submits that under *NLRB v. International Automated Machines, Inc.*, 285 NLRB 1122 (1987), the Board erred when it failed to draw an adverse inference from the Union's failure to call other attendees at the meeting to verify the accuracy of Mann's statement. *International Automated Machines* stands for the proposition that "when a party fails to call a witness who may reasonably be assumed to be favorably disposed to the party, an adverse inference may be drawn regarding any factual question on which the witness is likely to have knowledge." *Id.* at 1123. However, this argument by the OPW-FC must fail because the Board is only required to recognize that "an adverse inference *may be drawn*." *Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 907 (6th Cir. 1997) (quotation marks and citation omitted). As we observed in *Torbitt*, "[s]imply because the Board chose not to draw the adverse inference in this instance does not require this court to disturb that decision." *Id.*

Therefore and with recognition that (1) the administrative law judge had an opportunity to assess the credibility of each witness, *see Aquatech, Inc.*, 926 F.2d at 544, (2) the personal interests of each witness supports his findings, and (3) the Board's conclusions are supported by substantial evidence, this Court affirms the Board's findings which determined that the OPW-FC made a threat to the Union during the January 2003 meeting.

## B. The Board's Reliance on *Roadmaster*

Although the OPW-FC's argument that Cox is not entitled to protection under *Roadmaster* because it was his intent to deceive the Company has already been discussed and rejected, it submits as an alternative argument that *Roadmaster* was wrongly decided and should not be adopted by this Court.

As an initial matter, we find it unnecessary to reach the merits of this argument because of the failure by the OPW-FC to proffer its objections about *Roadmaster* to the Board. Section 10(e) of the Act provides in relevant part that "[no] objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be

excused because of extraordinary circumstances." 29 U.S.C. § 160(e).  In *Kitchen Fresh, Inc. v. NLRB*,  we determined that "in light of the Board's persistent refusal to [adhere to the particular objection by parties,] . . . the futility of . . . [the] objection amounts to an 'extraordinary circumstance' which excuses the petitioner's failure to object . . . ." 716 F.2d 351, 357 (6th Cir. 1983).

Here, the OPW-FC submits that voicing an objection to the applicability of *Roadmaster* before the Board would have been an act of futility because "[i]t is more likely that the Board would have continued 'pressing its own view of the law . . . .'" Pet'r/Cross-Resp't's Reply Br. at 4 (citing *NLRB v. Goodless Brothers Electric Co, Inc.*, 285 F.3d 102, 107 (1st Cir. 2002)). However, *Kitchen Fresh* contains a set of  facts that are inapposite to this case because the OPW-FC has failed to demonstrate that the Board has "persistently refused" to overturn *Roadmaster*. The OPW-FC's observation that the Board has consistently cited *Roadmaster* with approval in the past does not excuse the Company from raising the issue in a timely and proper manner.  This contention by the OPW-FC does not persuade the Court that the Board was "committed to pressing its own view of the law," or that it would not have been amenable to reconsidering *Roadmaster*.

Notwithstanding the procedural deficiencies of the OPW-FC's positions, the Court will briefly address the merits of these arguments. In its brief, the Company argues that the holding in *Roadmaster* (namely, that a union official's signing of two employees' names on a grievance form is "protected activity" under the Act so long as the official did not have the intent to deceive) is irrational and inconsistent with the Act. First, it submits that *Roadmaster* undermines the Act's foundational principle of "encourag[ing] . . . collective bargaining and other 'practices fundamental to the friendly adjustment of industrial disputes arising out of differences in wages, hours, or working conditions,' . . . by allowing employees to forge grievances or, in any way, dishonestly process grievances, even if their dishonesty is not accompanied by an intent or ability to deceive their employer." Pet'r./Cross-Resp't's Br. at 21 (internal quotation marks and citations omitted). Foremost, this argument stretches the holding of *Roadmaster. Roadmaster*'s holding does not "allow[] employees to *forge* grievances." *Id.* (emphasis added). Rather, the *Roadmaster* case simply defines "forgery." In its development of this definition, the *Roadmaster* court declared that in order to satisfy the standard of  a "forgery," the employer must show that the employee had an intent to deceive.  Hence, the mere act of signing another employee's name without the requisite intent does not constitute an act of forgery. Thus, this argument by the Company misrepresents the holding in *Roadmaster* and must be rejected.

Moreover, the OPW-FC maintains that the rationale in *Roadmaster* directly "conflicts with Section 10 (c) of the Act." *Id.* at 22.  Section 10 (c) provides that  "[no] order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." 29 U.S.C. § 160 (c) .  Here, the Company maintains that "[t]he Board's rule in *Roadmaster* does what Section 10 (c) was designed to prevent: interferes with an employer's unconditional right to discharge an employee for cause." Pet'r./Cross-Resp't's Br.  at 23.  However, this argument is based upon a false premise; namely, that Cox's conduct constitutes a "cause" under Section 10 (c). The mere act of signing another employee's name on a grievance form without an intent to deceive does not constitute a "forgery," and, thus, it does not constitute a "cause" under Section 10 (c).

III.

For the reasons that are stated above, we affirm the findings of the NLRB on all grounds.