OHIO POWER COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 75–1119.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 7, 1975.

Decided July 20, 1976.

Guy Farmer, John A. McGuinn, William A. Gershuny, Farmer, Shibley, McGuinn & Flood, Washington, D. C., R. M. Rybolt, James K. Brooker, Day, Ketterer, Raley, Wright & Rybolt, Canton, Ohio, for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Allison W. Brown, Jr., Madge F. Jefferson, William R. Stewart, N.L.R.B., Washington, D. C., for respondent.

Before EDWARDS, PECK and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

This matter is before the court for consideration of a petition for review by Ohio Power Company and a cross-petition for enforcement of an order of the National Labor Relations Board dated November 27, 1974, reported at 215 NLRB No. 13. The issues presented arise from discharge of two employees during the course of an economic strike by the members of Local 696, International Brotherhood of Electrical

Workers, at the company's Steubenville Division between July 1, 1973 and December 4, 1973. The Board ordered reinstatement of Joseph F. Campbell and Larry J. Greene upon a finding that the company had unlawfully discharged them in violation of § 8(a)(3) and (1)[1] of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) and (1).

The company asserts that in each instance the employee was discharged because of misconduct. In the case of Campbell, the company asserts that the misconduct complained of did not occur during the course of protected activities under the Act, but was unrelated in time or place to picketing or other strike activities. The discharges involve separate incidents and are treated separately.

### JOSEPH CAMPBELL

In the early morning hours of October 21, 1973, a truck collided with a power pole adjacent to a two-lane asphalt highway outside the corporate limits of Bellaire, Ohio. The collision severed the pole in half, severely damaged the truck, and shut off electrical power in the vicinity. Alvin E. Mayer, a working foreman, and Kenneth Dawson, an area foreman, were reached at their home and together they traveled in one of the company's 35 ft. elbow trucks to the scene to restore electric service and to remove the pole butt which was then blocking the road. Dawson and Mayer arrived upon the scene at approximately 1:30 a. m. and brought their truck to a halt in the eastbound lane of the road just west of the accident scene. In the meanwhile word of the power failure had reached a striking employee, Joseph Campbell, who lived nearby. Campbell and two other striking employees, Larry Campbell and Gabriel Gasbarre, drove to the scene, arriving there in advance of the company truck bringing Mayer and Dawson. Shortly before Joseph Campbell had an unsatisfactory telephone conversation with the dispatcher on duty in the company offices in an effort to find out what had happened and what was being done to correct the power shutoff. The three strikers brought picket signs with them, but upon arrival, decided to leave them in the car. The testimony concerning what happened thereafter was characterized by the Board as being "in sharp conflict".

According to Mayer, following a conversation between himself and Joseph Campbell in the middle of the road, Mayer turned toward the accident scene only to have Campbell grab him from behind and throw him to the ground, Mayer falling on his left side but sustaining only a scraped elbow and small finger.

In contrast, Joseph Campbell claimed that the two men were talking when Campbell slipped down off the truck and collided "chest-to-chest" with Mayer, causing him to slip and fall on gravel which had accumulated on the pavement.

Mayer and Dawson reported the incident to the company that night, and thereafter a letter was sent to Joseph Campbell notifying him that he was discharged for an "act of unprovoked aggression against a supervisor". Campbell was discharged by Clayton Wright, Division Manager of the Steubenville Division, whose investigation included personal discussions with both Mayer and Dawson, but not with Campbell, or any other witnesses.

In his decision following the hearing, the Administrative Law Judge made several alternative findings. Specifically, he held that the investigation by Wright was neither reasonable nor in good faith and that Wright's reasons for discharging Campbell were pretextual. He further found that even if, *arguendo*, Dawson's and Mayer's version of the encounter was accepted, Campbell's conduct fell "within that catego-

---

1. Section 158:

    (a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

(3) by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization . . . .

With regard to Joseph Campbell, the Board found that his discharge violated § 8(a)(1) only.

ry of trivial and inconsequential scuffles which do not deprive an employee of the protective mantle of the act". Finally, the Administrative Law Judge found that as a matter of fact Joseph Campbell did not engage in the conduct attributed to him and that therefore the discharge was in violation of § 8(a)(3) and (1) of the Act, citing *N.L.R.B. v. Burnup and Sims, Inc.*, 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964).[2]

The Board, on review, declined to adopt the Administrative Law Judge's conclusion that the assigned reason for the discharge of Campbell was pretextual. It did, however, support the Administrative Law Judge in his finding that Mayer had collided with Campbell, stumbled backwards and then lost his footing. The Board held that the misconduct which was alleged as the basis for the discharge did not in fact occur, and that under the principles of *Burnup & Sims, supra*, Campbell's discharge violated § 8(a)(1) of the Act. The Board further went on to observe that since Campbell had not in fact engaged in the misconduct attributed to him by Respondents' witnesses, "we deem it unnecessary to pass upon his alternative finding that the misconduct, even if it occurred, was not sufficiently serious to justify discharge".

On review, the company raises several issues. As a threshold question, the employer asserts that there is no substantial evidence to support the finding of the Board that Campbell was engaged in protected activity at the time of the incident. Therefore, it contends, the reasonableness of the discharge could not be at issue since an employer may " 'discharge [an] employee for good cause, bad cause, or no cause at all' ", *N.L.R.B. v. Howell Automatic Machine Co.*, 454 F.2d 1077, 1080 (6th Cir. 1972), so long as that discharge is not motivated by unlawful considerations. The company claims that the record is clear that neither Campbell nor the other fellow strikers were engaged in picketing or other strike related activities. It points out that the accident happened in the middle of the night, far from the scene of normal picketing activity and that, in fact, the three strikers had concluded upon arrival at the scene that they would not even take out their picket signs.

■ The company further contends that Campbell's conduct, even as found by the Administrative Law Judge and the Board, was sufficiently serious to warrant discharge.[3] The company notes that it is undisputed that at the time when the repair truck arrived on the scene, Campbell left the group of onlookers and began talking to Mayer about how thin his patience was growing, and that the exchange between the two men was heated. Further, the company contends that even under the version of the events credited by the Administrative Law Judge, it is undisputed that Campbell came down from the fender of the repair truck where he was sitting and collided with Mayer, knocking Mayer backwards and onto the ground. Further, Campbell thereafter attempted to interfere with efforts to remove the broken utility pole and reopen the blocked highway to traffic, until directed to refrain by a police officer at the scene.

The Board counters by noting that there is no evidence in the record to support an

---

**2.** It seems fair to conclude that he found that at the time of the incident Joseph Campbell was engaged in activity protected under § 7 of the Act and that thus a good faith, though mistaken belief, would not justify the discharge where the employee was not in fact guilty of any misconduct.

**3.** The Board initially argues that this argument was not specifically urged before the Board and that therefore, under § 10(e) of the Act, it cannot be considered by the Court. This contention is without merit. In its arguments to the Board, the company claimed that Campbell's misconduct in attempting to stop removal of the sheared pole was sufficiently serious to warrant his discharge. It does not appear that the company specifically contended that Campbell's other acts, even as found by the Board, were sufficient to warrant discharge, because the company was arguing that the Administrative Law Judge's factual findings in this regard were incorrect. Nevertheless, this issue of whether Campbell's misconduct justified his discharge was before the Board, and we do not think the company was barred from presenting it here.

assertion that Campbell's conduct interfered or hindered the completion of the repair work which was undertaken. It notes that the collision between Mayer and Campbell resulted in only minor injuries to Mayer. Further, the Board contends, while Campbell did attempt momentarily to prevent the removal of the broken utility pole, he abandoned his efforts when directed to do so by a policeman.

As we agree with the Company's contention that Campbell's misconduct was sufficiently serious to warrant discharge, we need not decide whether Campbell had been engaged in protected activity at the time the misconduct occurred.

We begin our analysis by noting our standard of review of the decision of the Board on this point:

> [N]ot every impropriety committed during [section 7] activity places the employee beyond the protective shield of the act. The employee's right to engage in concerted activity may permit some leeway for impulsive behavior, which must be balanced against the employer's right to maintain order and respect. [Citation omitted.] Initially, the responsibility to draw the line between these conflicting rights rests with the Board, and its determination, unless illogical or arbitrary, ought not be disturbed.

*N.L.R.B. v. Hartmann Luggage Co.*, 453 F.2d 178, 183–184 (6th Cir. 1971).

Nevertheless, we have recognized in many cases that an employer is not required to countenance all misconduct by an employee, and we have carefully examined the acts of the employee to determine whether they are beyond the pale of protected activity under Section 7. *N.L.R.B. v. Hartmann Luggage Co., supra; Kayser-Roth Hosiery Co., Inc. v. N.L.R.B.*, 447 F.2d 396 (6th Cir.

1971); *W. J. Ruscoe Co. v. N.L.R.B.*, 406 F.2d 725 (6th Cir. 1969).

Given the exceptional circumstances present in this case, we conclude that Campbell's misconduct was sufficiently serious to justify his dismissal, and we therefore deny enforcement of the Board's order in his case. We consider several factors important. First, the supervisors were engaged in emergency repair work at approximately 1:30 a. m. When the truck arrived, Campbell left the area where the other strikers and the onlookers were gathered and jumped up on the fender of the company's truck. The record indicates that at this point the two supervisors had just begun to survey the area where the accident had occurred, and did not as yet know whether there were any downed power lines or live wires.

According to Campbell's own testimony, he began a discussion with Mayer stating how his patience was getting thin. Apparently, Campbell's statements angered Mayer[4] because at this point Mayer came at Campbell and as Campbell arose from the truck, the two men bumped "chest-to-chest." The force of the collision knocked Mayer back and he slipped onto the ground.[5] He sustained slight injuries from the fall. Although there was no evidence that either man had to be restrained subsequent to the bumping incident, onlookers apparently considered the situation quite serious. Police Officer Warnock testified that immediately after Mayer fell, he came over to Campbell and told him to back away, so there would not be any trouble. Thereafter the repair work continued until Campbell attempted to stop removal of the sheared pole from the highway, and was directed by a police officer who was present

---

4. The discussion at this point turned to loud argument. Officer Glenn Warnock, whose testimony "particularly impressed" the Administrative Law Judge, was standing some 35 to 45 feet away from Mayer and Campbell, testified that his attention was drawn to the altercation upon hearing people start to argue. To the extent the Board's findings indicate that the incident between Mayer and Campbell was to-

tally accidental and that there was no altercation between the parties, it is without support in the record as a whole. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

5. This is the version credited by the Board. While, upon the record as a whole it strains credulity, we accept it.

to cease interfering with the emergency repair work.

The critical factor in evaluating whether Campbell's conduct warranted discharge, we think, is the emergency nature of the repair work being performed by the company supervisors. Had the supervisors been on an ordinary repair call during daylight hours, we might agree with the Board that Campbell's misconduct was not so serious as to justify his discharge. Here, however, an emergency situation clearly existed and Campbell's conduct must be evaluated in that context. Campbell had no business entering the area where the emergency repair work was being performed. Accepting the Board's conclusion that Campbell did not deliberately assault Mayer, it is undisputed that his comments to Mayer provoked the altercation which led to Mayer being knocked backwards, and that a police officer, standing some 35 to 45 feet away, felt the situation was serious enough to ask Campbell to back away so trouble could be avoided. Finally, Campbell continued to disrupt the emergency repair work by attempting to stop the removal of the sheared pole.

Although no serious disruption of the repair work occurred, such disruption might have occurred had Mayer been provoked to retaliate, or had the police not been present to threaten Campbell with arrest if he did not stop interfering with removal of the severed pole. Accordingly, enforcement of the Board's order with regard to Campbell is denied.

### LARRY GREENE

■ The facts leading to Larry Greene's discharge are in most respects undisputed. On August 10, 1973, Greene and two other strikers were walking to picket the site of a repair job being performed by the company in Steubenville. As Greene and the others reached the southeast corner of the intersection of North and 4th Streets, a company truck which had just left the worksite stopped for a red light at the intersection. In it were line foreman Ross Lee Cunningham and working foreman Walt Williams. Cunningham was driving. Greene yelled "Don't you know we're on strike?" and made some comments that the two non-union men were not observing safety rules. Greene then ran out into the intersection, grabbed Cunningham's cigar from his mouth and threw it to the ground. Based solely upon this incident, Greene was discharged.

The Board affirmed the findings and conclusions of the Administrative Law Judge that the conduct complained of was an isolated expression which did not upon the circumstances create a safety hazard jeopardizing either company equipment or personnel. While such conduct is not to be condoned, we are unwilling to disturb the findings and conclusions reached by the Administrative Law Judge and adopted by the Board. At the time of his discharge Greene was the Recording Secretary for the Union and the evidence suggests that the incident was exaggerated and that Greene's discharge for the alleged misconduct was pretextual. As we noted earlier, the determination as to whether employee misconduct justifies dismissal lies with the Board, and we will not upset that determination unless arbitrary or illogical. *N.L.R.B. v. Hartmann Luggage Co., supra.* The Board's determination that Greene's admitted misconduct was not so serious as to justify his discharge is not so arbitrary or illogical as to be overturned here.

■ The company further claims that the Administrative Law Judge's credibility resolutions "are so tainted by his demonstrated bias and prejudicial conduct as to render erroneous, as a matter of law, the Board's adoption of such findings based on the credibility resolutions." The Board's concern over the charge is evident in its decision.[6]

---

**6.** In commenting upon the Administrative Law Judge's conduct of the hearing, the Board noted:

Thus, the Administrative Law Judge's questioning of Wright, while perhaps somewhat lacking in tact, was clearly permissible under Sec. 102.35 of the Board's Rules and

We have little to add to the Board's comments except to hold that if the Administrative Law Judge's conduct was less than a model of judicial objectivity, it was not so lacking therein as to deny enforcement solely on this basis.

Enforcement is denied of that part of the order of the Board which directs reinstatement with back pay of Campbell. In all other respects enforcement is granted.

EDWARDS, Circuit Judge, concurring in part and dissenting in part.

In the course of an apparently quite bitter six months long strike at the Ohio Power Company in 1973, a number of strikers were discharged. We are informed that the Board has affirmed the discharges in seven out of nine litigated cases.

This case originally pertained to three such discharges, one of which the Board treated as a valid discharge, and as to two of which it ordered reinstatement and back pay for the discharged employees, Campbell and Greene. The company has petitioned to review the order of the Board and the Board has petitioned for enforcement as to these two employees. The Board's opinion is reported at 215 N.L.R.B. No. 13.

I concur in Judge Engel's opinion granting enforcement of the Board's order as to Greene.

Campbell's discharge presents the question as to whether the Board was right in finding that the altercation which led to the discharge occurred in a situation similar to a picket line and, hence, was protected activity. A review of the record convinces me that it was.

Secondly, the case presents the question as to whether or not there is substantial evidence on the whole record to support the version of the events which the administrative law judge and the Board accepted. Among other findings by the administrative law judge and the Board are the following:

In any event, I am not satisfied that Respondent has demonstrated that Campbell's conduct was sufficiently serious to justify the discharge in question. Even accepting, *arguendo,* Dawson and Mayer's version of the critical encounter, Campbell's conduct was obviously limited to a spontaneous outburst which did not interfere with the work of the two foremen, did not result in mentionable injury to Mayer,[6] was not shown to have occurred

[6] Mayer testified that he scraped his elbow and left middle finger as a result of falling to the roadway. No treatment was necessary and his ability to work was not impaired.

in a context of violence, and was an isolated incident not likely to trigger misconduct on the part of fellow strikers. Against this background, considering the combined testimony of Dawson and Mayer, that Campbell's activities were neither fear inspiring, nor violent, and undertaken without apparent anger, I find that the alleged misconduct of Joseph Campbell falls within that category of trivial and inconsequential scuffles which do not deprive an employee of the protective mantle of the act.[7]

[7] *Buitoni Food Corp.,* 126 NLRB 767, 783; *Huss & Schlieper Co.,* 194 NLRB 572, 577; *Beaver Bros. Baking Co., Inc., d/b/a American Beauty Baking Co.,* 171 NLRB 700, 719.

Finally, and also in the alternative, I find on the basis of the credited testimony of Joseph Campbell, as corroborated by fellow striker Larry Campbell, and Bellaire police officer, Glen Warnock, that Joseph Campbell did not assault

Regulations, Series 8, as amended, which makes it the duty of the trier "to inquire fully into the facts." As to the alleged repetitious questioning by Charging Party's counsel, Sec. 102.38 of the Rules and Regulations provides that any party to an unfair labor practice proceeding "shall have the right" to appear and to participate fully in such proceeding. Although the Administrative Law Judge may, in his discretion, limit such participa-

tion, we find no abuse of discretion here. Finally, while the Board does not approve the Administrative Law Judge's characterization of himself or other Administrative Law Judges as members of a "new breed," the term is not in and of itself invidious nor does it suggest that his findings and conclusions are other than objective. (N.L.R.B. decision, footnote 1).

Mayer and that Mayer's falling to the ground was attributable to other causes.[8]

[8] Much of the record herein is devoted to efforts by various counsel to elicit testimony as to contradicted minor matters such as distances and the location of various witnesses in relation to the Mayer-Campbell confrontation. These matters are subsidiary to the critical question herein; i.e. the cause of Mayer's falling to the ground; they too may be resolved only through an assessment of conflicting testimony. As such, they raise purely collateral credibility issues which are of no aid in assessing the conflicting testimony on the critical issue presented. Their resolution would serve no purpose other than to prolong the analysis and discussion of this phase of the case.

I do so because not persuaded as to truthfulness of the accounts related by Mayer and Dawson. They would have me believe that Campbell who impressed me as mild-mannered and of temperate, stable disposition, without provocation, and in the presence of witnesses, including law enforcement officers, after a conversation in which Campbell reflected no temperament, grabbed Mayer from the rear and shook him, throwing him to the ground with Mayer landing some 10 feet away from the point of confrontation on the birm of the road. Mayer and Dawson impressed me as uneasy in their role as witnesses against Campbell and the testimony of both shifts from what appears to be an exaggeration of Campbell's misconduct to what in other respects seems a mitigation of Campbell's role in the incident. The inability to assess which part of their testimony is truthful renders the entirety of their story both improbable and unreliable.[9] Although certain as-

[9] As indicated heretofore I am persuaded that the District was interested in making an object lesson out of Campbell. This may lend some explanation for the shifting nature of the testimony of Mayer and Dawson. My observation of Mayer and Dawson as well as the specifics of their testimony suggest that, having initially reported the incident to the Company, they subsequently may well have been torn to conflict by virtue of their sense of loyalty to the Company, yet on the other hand their displeasure with the severe discipline ultimately meted out in Campbell's case.

pects of the accounts given by the General Counsel's witnesses are not entirely free from doubt, I find, as the more probable, considering the entire setting of the incident, [that Mayer went to the ground after having lost his footing, following a collision with Campbell, of a type which hardly could be described as a deliberate act of aggression.] In crediting Joseph Campbell and Larry Campbell in this regard, I was particularly impressed with the corroborating testimony of Police Officer Warnock. It is true that, like the Campbells, he was a native of Bellaire, and knew Larry Campbell and Gasbarre and had known of Joseph Campbell. I do not believe he officiously would have lied in Joseph Campbell's behalf. Accordingly I find that Joseph Campbell did not engage in the misconduct attributed to him.[10]

[10] In assessing credibility, I have considered evidence adduced by Respondent in an attempt to show that Joseph Campbell on the evening of October 21, was subject to pressures which, perhaps, rendered him prone to a loss of self control. From my observation of Joseph Campbell, and from the description related by Dawson and Mayer of his composure both before and after his collision with Mayer, I am not persuaded that, in the circumstance, these "pressures" would have triggered the type of impulsive assault attributed to him by Respondent's witnesses.

For all of the above reasons I find that Respondent discharged economic striker Joseph Campbell in violation of Section 8(a)(3) and (1) of the Act.[11]

[11] See *N.L.R.B. v. Burnup and Sims, Inc.* 379 U.S. 21, 23, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964).

I believe there is substantial evidence upon the whole record to support the findings quoted above and I would also grant enforcement as to the Board's order as to Campbell.

JOHN W. PECK, Circuit Judge, concurring in part and dissenting in part.

I am in agreement with the conclusion of the majority opinion in denying enforcement of the Board's order with regard to Joseph Campbell. However, Larry Greene, in my judgment, committed an assault and battery upon a supervisor which justified his discharge. The Board-adopted administrative judge's finding that the incident did not create a hazard to equipment or personnel is not, in my judgment, supported by substantial evidence, since it is conceded that the sixty-two year old victim of the

assault was the driver of a company vehicle which was stopped awaiting a light change at a busy intersection and who (despite a finding to the contrary) was clearly startled when something suddenly "brushed across" his face, and Greene's hand snatched the cigar from his mouth. In *N.L.R.B. v. Hartmann Luggage Co.,* 453 F.2d 178 (6th Cir. 1971), we denied enforcement as to an employee guilty of less provocative conduct in striking a vehicle, but without touching the driver, commenting, "Mrs. Jordan's striking of a passing automobile not only was a serious act of misconduct, but also might easily have incited her companions to further violence or have led to physical retaliation." 453 F.2d at 185.

I would deny enforcement of the Board's order as to Larry Greene.