*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0050p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW), AFL-CIO; LEO
ANDRE AHERN, an individual,

　　　　　　　　　　*Petitioners,*

　　　*v.*

NATIONAL LABOR RELATIONS BOARD,

　　　　　　　　　　*Respondent,*

OGIHARA AMERICA CORP.,

　　　　　　　　　　*Intervenor*.

No. 06-2156

On Petition for Review of an Order
of the National Labor Relations Board.
Nos. 7-CA-47942; 7-CA-48024.

Submitted: September 14, 2007

Decided and Filed: January 28, 2008

Before: NORRIS, GIBBONS, and ROGERS, Circuit Judges

---

## COUNSEL

**ON BRIEF:** Bruce A. Miller, Robert P. Fetter, MILLER COHEN, Detroit, Michigan, for
Petitioners. Aileen A. Armstrong, Robert J. Englehart, Gregory P. Lauro, NATIONAL LABOR
RELATIONS BOARD, Washington, D.C., for Respondent. Sean F. Crotty, HONIGMAN,
MILLER, SCHWARTZ & COHN, Detroit, Michigan, for Intervenor.

　　　GIBBONS, J., delivered the opinion of the court, in which NORRIS, J., joined. ROGERS,
J. (p. 11), delivered a separate dissenting opinion.

---

## OPINION

---

　　　JULIA SMITH GIBBONS, Circuit Judge. Petitioners International Union, United
Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL-CIO ("the
Union"), and individual Leo Andre Ahern seek review of the National Labor Relations Board ("the

Board") decision[1] finding that Ogihara America Corporation ("the Company") did not violate section 8(a)(1), (3) and (4) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158,[2] by discharging petitioner Ahern. Specifically, petitioners challenge the Board's determinations that: (1) employee Ahern lost the protection of the Act through his deliberate falsification; (2) the Company met its burden of showing that it would have discharged Ahern because of his falsification regardless of his union activity; and (3) petitioners did not meet their burden of establishing that Ahern's discharge was related to his board testimony. For the following reasons, we deny the petition for review and enforce the Board's order.

I.

In October 2003, the Union began an organizing campaign at the Company and successfully petitioned for a representation election. In the January 2004[3] election, the Company employees narrowly voted against union representation. However, following the Union's charges and a May 25 hearing, an administrative law judge ("ALJ") determined that before the election, the Company had illegally disciplined an employee for protected activities including distribution of union literature. The ALJ's July 12 order, which was later upheld by the Board, set aside the original election and called for a second election.

Ahern worked for the Company as a press maintenance technician on the second (afternoon and evening) shift and was active in the union campaign. He was also one of several employees who testified on behalf of the Union at the May 25 hearing. From about May 25 until July 12, Ahern and fellow second-shift technicians Thomas Griswold and Christopher Simmons became especially dissatisfied with supervisor, David Gaffka. The three technicians were bothered that Gaffka, an outspoken union opponent, was complaining to fellow supervisors about the poor work of employees despite his own poor work. After Simmons witnessed Gaffka harass another employee and then write him up for poor workmanship, the three technicians resolved to facilitate Gaffka's demotion by writing an anonymous letter to the Company President Tokio Ogihara. Ahern drafted the letter and made revisions based on Griswold's and Simmons's suggestions. The letter, dated June 2, and addressed to Ogihara, stated:

> We are writing to you as a group of associates both concerned, and disturbed by the conduct and behavior of one of your Press Maintenance Facilitators – Dave Gaffka. On several occasions, Dave has approached Troy Burley and other managers making accusations of alleged mistakes made by associates in their work. Dave was threatening that he would have people written up. Dave has been mistaken in many of these accusations–even accusing people of things that happened on days they were not even at work. This shows no regard for core values.
> We feel that Dave lacks the professionalism, technical skills, and the people skills necessary to be a facilitator at OAC. As a facilitator, he is a representative of

---

[1] *Ogihara Am. Corp.*, 347 N.L.R.B. No. 10, 2006 WL 1516768 (May 30, 2006).

[2] Section 158 provides in relevant part:
(a) It shall be an unfair labor practice for an employer
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
(3) by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization . . . .
(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter . . . .

[3] All dates are in 2004 unless otherwise indicated.

OAC and creates a bad image of this company. In this time of corporate cost cutting, we respectfully request that you personally investigate Dave's usefulness and impact to OAC. Turning this matter over to your management team will not solve the problem, as some of your managers promote this behavior. It is your choice to act on this matter or not to, however many associates would welcome the thought of you taking a more active part in managing the managers at OAC. If you choose not to respond please keep this confidential.

      Enclosed are photos of Dave's own poor workmanship.

      Thank you for your attention to this problem.

Ahern, Griswold and Simmons enclosed photographs and captions depicting poorly maintained areas in Gaffka's workspace. According to Griswold's and Simmons's testimony, the three technicians agreed to transmit the letter and photographs ("the package") anonymously because they feared reprisal if they included their names.

On June 9, Ahern visited the FedEx service desk at a Kinko's store to mail the package. A Kinko's employee instructed Ahern to fill out the sender's name and return address. Given the letter's anonymous character and Ahern's belief that the Company might not open a package from Ahern due to his union activity, Ahern instead listed Bruce Pierson as the sender of the package. Pierson was a first-shift employee opposed to union affiliation, and Ahern believed that Ogihara would be more likely to open a package addressed from Pierson than from himself. Rather than listing Pierson's address and phone number, Ahern listed the address for the county courthouse – which he found in the phonebook at Kinko's – and a fictitious phone number. Ahern testified that he used the fictitious address and phone number so that if Ogihara checked, he would realize that they were not Pierson's actual address and number.

Upon receiving the package on June 10, Ogihara directed Human Resources Manager Director Patrick Casady to investigate the letter's allegations. While Casady delegated investigation of the package's substantive allegations to another manager, Casady met with Pierson, who denied sending the package.[4] Casady also testified that either before or close to the same time that he met with Pierson, he had independently determined that the return address on the package did not match Pierson's. Around June 21, Casady contacted Kinko's and learned that it had videotape surveillance for the day the package was sent, which it could only release in response to a subpoena. On June 28, the Company commenced a lawsuit on behalf of Gaffka and Pierson, charging "John Doe" with defamation and tortious interference with their employment by sending the package. On August 2, after the Company obtained a subpoena, Casady viewed the tape, determined that Ahern had sent the package, and decided to discharge Ahern. Although Casady testified that he recognized that it was not improper for an employee to send an anonymous letter criticizing a supervisor, the Board determined that Casady's reasons for the discharge were Ahern's false designation of Pierson as the sender of the package and false allegations against Gaffka.[5] On August 3, Casady met with Ahern. When Ahern denied sending the package, Casady informed him that he had been seen on the Kinko's tape and that his deceptive acts warranted termination under the Company rule of conduct

---

[4] The ALJ found that Casady was not credible in his assertion that he needed to ascertain who sent the package to "find out what the issues were and try to determine who had the issues so that [the Company] could further investigate Mr. Gaffka." Casady recognized that he could have investigated the allegations without speaking to the person who sent the package. The Board found no basis for overturning this credibility determination.

[5] Gaffka maintained that some of the assertions in the letter were inaccurate. Although the Company claimed that Ahern also lost his protection of the Act due to this falsification, the Board did not reach this issue.

31.[6]  Casady's August 4 letter to Ahern confirmed his termination and included  a "rules of conduct violation form," which noted violations of rules 19, 21, and 31 and that the rule 31 violation was the "most severe."[7]

After the Union and Ahern filed separate charges with the Board, the Board's General Counsel issued a complaint alleging, *inter alia*, that the Company had violated section 8(a)(1), (3), and (4) of the Act, 29 U.S.C. § 158(a)(1), (3), and (4).  The consolidated cases were heard before an ALJ, who decided that *inter alia*, the Company's discharge of Ahern had violated section 8(a)(1), (3), and (4) of the Act.[8]   The Board reversed the ALJ's decision with respect to these three allegations, each of which the Board dismissed.  The Board's decision is before the court.

## II.

This court reviews determinations of law *de novo* and findings of fact for substantial evidence. *Harborside Healthcare, Inc. v. NLRB*, 230 F.3d 206, 208 (6th Cir. 2000).  The substantial evidence standard also applies to the Board's application of law to particular facts. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951);  *Turnbull Cone Baking Co. of Tenn. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985).  For this court to affirm under the substantial evidence standard, the Board's decision must be supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera,* 340 U.S. at 477.  Courts must "respect the judgment of the agency empowered to apply the law 'to varying fact patterns.'" *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 399 (1996) (quoting *Bayside Enters., Inc. v. NLRB*, 429 U.S. 298, 304 (1977)).  Thus, "the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion had the matter been before it *de novo*." *Harborside*, 230 F.3d at 208 (internal quotations and citations omitted).  This same deference applies even if the Board and ALJ relied on the same facts, yet reached different conclusions.  "Our deference to findings of fact runs in favor of the Board, not in favor of the ALJ." *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995).  Still, "the ALJ's findings are part of the record we must review[,]" and therefore we take them into account to the extent that they reduce the weight of the evidence supporting the Board's conclusion. *Id.*

## III.

Petitioners first argue that the Board erred in determining that Ahern lost protection of the Act by falsifying the sender's name on the package.  Section 8(a)(1) of the Act establishes that it is an unfair labor practice for an employer to interfere with an employee's section 7 rights, which

---

[6]The Company rules of conduct, in relevant parts, provide:

19.  Deliberate falsification of work sheets, official Company administrative forms, personnel or employment records, medical documentation, testimony at a Peer Review hearing, production records, etc.
21.  Displaying immoral conduct, participating in harassment of any nature toward or about any Associate of the company.
31.  Posting of materials, or the creating of graffiti with racial, sexist or religious symbols, or threatening commentary which do not reflect [the Company's] Core Values and may be intimidating to other Associates.

Casady testified that the "core values" in Rule 31 included integrity and honesty.

[7]The rules of conduct violation stated:

On 8/3/04 it was discovered that Andy sent a package from Kinko's of Novi to Mr. Ogihara.  The return address indicated Bruce Pierson, [but] Andy said Bruce had nothing to do with it.  The package contained a letter and pictures (letter is attached).

[8]*See Ogihara Am. Corp.*, 2005 WL 3005607 (Nov. 3, 2005).

include the right "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Here, the Board assumed *arguendo* that Ahern's complaints regarding Gaffka were protected but determined that Ahern lost the protection of the Act as a result of his intentional falsification.

The Board has held that "where an employee is discharged for conduct that is part of the res gestae of protected activities, the relevant question is whether the conduct is so egregious as to take it outside the protection of the Act, or of such character as to render the employee unfit for service." *Guardian Indus. Corp.* 319 N.L.R.B. 542, 549 (1995) (quoting *Consumers Power Co.*, 282 N.L.R.B. 130, 132 (1986)). Although some leeway is permitted for impulsive behavior, this must be balanced against an "employer's right to maintain order and respect. Initially, the responsibility to draw the line between these conflicting rights rests with the Board, and its determination, unless illogical or arbitrary, ought not be disturbed." *Ohio Power Co. v. NLRB*, 539 F.2d 575, 578 (6th Cir. 1976) (citing *NLRB v. Hartmann Luggage Co.*, 453 F.2d 178, 183-184 (6th Cir. 1971)).

The Board provided two reasons for determining that Ahern's actions had lost the protection of the Act. First, relying on *Guardian Industries*, 319 N.L.R.B. at 549, the Board explained that a "deliberate falsity" could cause an employee to lose the protection of the Act. Second, relying on *HCA / Portsmouth Reg'l. Hosp.*, 316 N.L.R.B. 919, 931 (1995), the Board noted that "activity designed 'to destroy the reputation and end the employment of another employee'" could also cause an employee to lose the Act's protection. The Board found that Ahern's use of Pierson's name on the package was a deliberate falsity and that this falsity "had the potential of harming Pierson's reputation and jeopardizing his employment." The Board explained that when Ahern sent the package,

> [he] feared that the [Company] would retaliate against the sender of the package. Nevertheless, Ahern engaged in a deliberate deception by listing Pierson as the sender of the package, even though Ahern knew that Pierson had not authorized the use of his name. Ahern thereby implicated Pierson in activity that Ahern himself believed would anger [the Company]. That Ahern may not have affirmatively intended to harm Pierson, and may have believed that the use of a fictitious address would ultimately absolve Pierson of any actual repercussions from the sending of the package is not determinative. The fact remains that Ahern's deliberate falsification posed a substantial risk to Pierson's reputation and employment status.

Consequently, the Board found that Ahern's misconduct was "sufficiently egregious to cause him to lose protection of the Act."

Petitioners essentially claim that the Board erred: (1) by misrepresenting the evidence; and (2) by determining that Ahern's "deliberate falsity" was egregious enough to cause him to lose protection of the Act.

Petitioners claim the Board misrepresented the evidence in two ways. First, petitioners contend that the Board erred by finding that when Ahern used Pierson's name on the package, he feared the Company would retaliate against *the sender* of the package. Petitioners assert that Ahern only feared retaliation against *himself* based on his union participation. But substantial evidence supports the Board's factual finding. Both Griswold and Simmons testified that the three technicians had sent the package anonymously based on their fear of repercussions. Moreover, Simmons acknowledged that these repercussions might exist for *whoever* put their names on the package.

Petitioners also challenge the Board's determination that Ahern's falsification had the potential to harm Pierson's reputation and employment status. Yet substantial evidence supports the Board's determination on this point as well. Although Ahern's inclusion of a false address and

telephone number may have *reduced* the risk that Pierson would be implicated, the Board reasonably determined that Ahern "implicated Pierson in activity that Ahern himself believed would anger [the Company]." That Ahern's falsification did not *actually* harm Pierson does not mean that it did not still pose a "substantial risk" at the time.[9]

Petitioners' stronger argument is that Ahern's falsification was not sufficiently egregious to cause him to lose protection of the Act. Specifically, petitioners contend that an employee's falsification must be deliberate *and malicious* to lose protection of the Act and that Ahern's falsification should remain protected because it was not malicious.

The narrow question of whether prior Board decisions have established that a deliberate falsification must be malicious to lose protection of the Act is a pure question of law that the court reviews *de novo, see Harborside Healthcare,* 230 F.3d at 208, subject to whatever deference is required by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). However, if there is no such legal requirement, then the Board's application of the law to the facts – *i.e.* whether Ahern's conduct was sufficiently egregious to cause him to lose protection of the Act – is a line-drawing exercise, in which the Board's line should not be disturbed unless it is "illogical or arbitrary." *See Ohio Power,* 539 F.2d at 578.

Although the Board has consistently provided that a deliberate falsification *may* lose the protection of the Act, it has not clarified whether malice *must* accompany the deliberate falsification. *See, e.g., Puerto Rico Sheraton Hotel,* 248 N.L.R.B. 867, 874 (1980) (enforcement denied on other grounds by *N.L.R.B. v. Sheraton Puerto Rico Corp.*, 651 F.2d 49 (1st Cir. 1981)) (noting that disqualifying conduct might include, *inter alia*, "malice, deliberate intention to falsify . . . [or] deliberate *and* malicious falsehood.") (emphasis added); *Am. Hosp. Assn.*, 230 N.L.R.B. 54, 56 (1977) (listing "malice *or* deliberate intention to falsify" and "deliberately *and* maliciously false" as conduct that could lose protection of the Act) (emphasis added); *Am. Shuffleboard Co.*, 92 N.L.R.B. 1272, 1274 (1951) (employee remained protected where his statements were not "deliberately *or* maliciously false") (emphasis added).

In finding that deliberate falsity could be disqualifying, the Board cited *Guardian Industries*, 319 N.L.R.B. at 549. In that case, an employee criticized his employer for requiring a co-employee to submit to drug testing "without cause at all." *Id.* at 545. The employee's statement was inaccurate in that the co-employee eventually failed the drug test. *Id.* at 549. But the Board held that "protection is not denied to an employee regardless of the inaccuracy or lack of merit of employee's statements absent deliberate falsity *or* maliciousness. . .." *Id.* (emphasis added). Taken out of context, this statement might suggest that a deliberate falsity alone could be disqualifying – regardless of whether malice was present. But the Board emphasized that the employee's statements were not "maliciously calculated or uttered in anything but a good-faith belief in [the co-employee's] cause." *Id.*

---

[9] Petitioners also suggest that the Board's statement of facts was incomplete because it omitted Ahern's explanation that he used Pierson's name "only to make sure that the letter would be opened and looked at." The Board characterized Ahern's decision as follows:

> Due to the anonymous nature of the package and Ahern's belief that the Respondent would be hostile to him because of his union activity, Ahern decided against using his own name and address. . . . Ahern believed that listing Pierson's name on the return address would be more likely to evoke a response from Ogihara concerning the employee's complaints.

Substantial evidence, including the testimony of Ahern, Griswold, and Simmons, supports the Board's characterization.

Consistent with *Guardian Industries*, the Board has found that deliberate falsifications remain protected by the Act when the falsifications have been made in good faith. For example, in *Roadmaster Corp.*, the Board determined that an employee acting as grievance committeeman remained protected despite forging the names of other employees on grievance forms in an effort to preserve their grievances before an impending deadline. 288 N.L.R.B. 1195, 1197 (1988) (finding employee's actions were "reasonable responses" to the situation.) Enforcing the Board's order, the Seventh Circuit further emphasized that the employer had not tried to deceive his employer. *Roadmaster Corp. v. NLRB,* 874 F.2d 448, 453-454 (7th Cir. 1989). Likewise, in *OPW Fueling Components*, where a union steward signed the names of two employees on a formal grievance, this court, in upholding the Board's determination that the steward did not lose the protection of the Act, emphasized that the steward had "(1) acted in good faith and for legitimate reasons and (2) did not have an intent to deceive his employer." 443 F.3d 490, 496 (6th Cir. 2006).

By contrast, in *HCA/ Portsmouth,* the Board found that a falsification was disqualifying where it was, among other things, "deliberate *and* malicious." 316 N.L.R.B. at 930 (emphasis added) (also finding that the conduct was "defamatory," and in "bad-faith.) In that case, an employee purposefully spread false and damaging rumors about a supervisor in an attempt to destroy the supervisor's reputation and have her fired*. Id.*

Reading these Board decisions together, we think the determinative question is whether an employee's conduct is sufficiently "egregious" to cause him to lose protection of the Act. *Guardian Indus.,* 319 N.L.R.B. at 549; *Consumers Power Co.*, 282 N.L.R.B. at 132. Although a deliberate and malicious falsification will likely be *sufficiently* egregious, we cannot say that the Board must *necessarily* find malice *per se* to find a falsification disqualifying. Absent good faith, deliberate falsifications may lose the protection of the Act if the circumstances suggest that the falsification was sufficiently egregious. *See HCA/ Portsmouth,* 316 N.L.R.B. at 930.

Nor can we say that the Board's determination here – that Ahern's deliberate falsification was sufficiently egregious to lose protection of the Act – was illogical or arbitrary. *See Ohio Power,* 539 F.2d at 578. To be sure, arguably Ahern's inclusion of Pierson's name on the package was closer in nature to the forgeries in *Roadmaster* and *OPW* (which were not disqualifying) than to the conduct in *HCA / Portsmouth* (which was disqualifying). After all, whatever risks Ahern's conduct created for Pierson, Ahern's primary objective – like the objective of employees in *Roadmaster* and *OPW* – was to effectively advance his grievance. But the Board distinguished *Roadmaster* and *OPW* from the instant case because: (1) neither of those cases involved falsehoods intended to implicate another individual in activity that the employee feared would provoke employer reprisals; and (2) the falsehoods in *Roadmaster* and *OPW* were connected to, and arguably necessary for, preserving employees' grievances.

Petitioners argue that Ahern's falsification was also necessary for his complaint to be heard. But even if signing his own name would have reduced the likelihood of Ogihara opening the package, falsifying Pierson's name was hardly Ahern's only alternative. Ahern could have listed a fictional name to satisfy Kinko's request, or used regular mail without including any sender's name or address. Both methods would have been consistent with the technicians' original plan to send the package anonymously. Thus, the Board reasonably concluded that "there was no necessary link between [Ahern's] falsity and the complaints raised by the employees."[10]

---

[10]*NLRB v. Allied Aviation Fueling of Dallas LP*, 480 F.3d 374 (5th Cir. 2007), and *CDA Inc.*, 349 N.L.R.B. No. 58, 2007 WL 950940 (March 26, 2007), are both distinguishable on the same bases that the Board distinguished *Roadmaster and OPW*: (1) neither involved falsehoods intended to implicate another in activity that the employee feared would provoke employer reprisals; and (2) the falsehoods in those cases were at least more connected to, if not necessary for, initiating a grievance.

This court must "respect the judgment of the agency empowered to apply the law to varying fact patterns," *Holly Farms,* 517 U.S. at 399 (internal quotation and citation omitted). Because we cannot say that the Board's distinctions were illogical or arbitrary, *see Ohio Power,* 539 F.2d at 578, substantial evidence supports the Board's determination that Ahern's conduct lost the protection of the Act.

IV.

Petitioners next claim that the Board erred in dismissing their allegation that the Company violated section 8(a)(3) of the Act, 29 U.S.C. § 158. Section 8(a)(3) prohibits an employer from, *inter alia*, discharging an employee for engaging in protected union activities.[11]

To establish a violation of section (a)(3), the General Counsel must first show that an employee's protected activity was a motivating factor in his discharge. *OPW*, 443 F.3d at 498. Upon this showing, the burden shifts to the employer to show that the discharge would have occurred regardless of the protected conduct. *Id.*[12]

Here the ALJ determined that the General Counsel had met its burden of showing that Ahern's union activity was a motivating factor and that the Company had not met its burden of showing that it would have discharged Ahern for sending the package absent his union activity. In reaching this conclusion, the ALJ noted that, *inter alia*: (1) the Company's reasons for tracking down the package's sender were "shifting and pretextual"; (2) the sanction (discharge) was severe; (3) the timing of the discharge (shortly after the Union overturned the previous election result) was suspicious; and (4) Ahern had no prior disciplinary record.

On review, the Board found that the Company had met its burden[13] by establishing that it had a legitimate reason for discharging Ahern – his unprotected act of writing Pierson's name on the package. The Board reached this conclusion by finding that: (1) the Company had consistently maintained that it fired Ahern for his actions related to the package; (2) the Company considered Ahern's actions to have violated its rules of conduct; and (3) there was no evidence that the Company had failed to discharge other employees for similar conduct.

---

In *Allied Aviation,* a union representative facing an impending deadline signed a fellow employee's name to a grievance filed on behalf of the fellow employee. 490 F.3d at 376-77. After explicitly finding that the representative had acted upon the good faith belief that his falsification was necessary to maintain the employee's claim, the Board found that he remained protected under the Act. *Id.* at 380. In *CDA,* the Board determined that an employee remained protected by the Act despite filing a grievance on behalf of other employees without their consent. 2007 WL 950940, at *9. There was no evidence that the employee feared reprisals based on her actions. Moreover, the Board emphasized that the falsified document was an official union grievance form, *id.*, and so arguably the falsification was more connected to the filing of an official grievance than Ahern's falsification in this case.

[11]29 U.S.C. § 158(a) provides:

> It shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

[12]This test was articulated by the Board in *Wright Line*, 251 N.L.R.B. 1083, 1985 (1980), and approved by the Supreme Court in *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 397-403 (1983) (overruled on other grounds by *Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 277-78 (1994)).

[13]The Board assumed *arguendo* that the General Counsel had met its burden by showing that Ahern's union activity was a motivating factor in his discharge.

Petitioners challenge the Board's determination in two ways. First, petitioners contend that Ahern did not actually violate the Company's rules of conduct. This argument misses the point. Although Casady's application of the Company's rules may have been questionable, the Board found that Casady considered Ahern to have violated company policies. This *perceived violation* (as opposed to Ahern's union activity) was a legitimate reason for Ahern's discharge.

Petitioners also argue that the Board ignored the circumstantial evidence surrounding Ahern's discharge. But the board did not ignore this evidence. Rather, it found that because the Company consistently maintained in its termination letter and at trial that Ahern's falsification of Pierson's name alone caused the termination, it "disagree[d] with the [ALJ's] finding that [the Company's] reasons were shifting and pretextual." Although the circumstantial evidence relied upon by the ALJ might have also supported a determination that the Company had not met its burden, substantial evidence still supports the Board's determination that the Company would have discharged Ahern for falsifying Pierson's name regardless of his union involvement.

## V.

Finally, petitioners argue that the Board erred in finding that the Company did not violate section 8(a)(4), which prohibits an employer from discharging an employee for testifying at a Board proceeding.[14] Section 8(a)(4) claims are analyzed under the same burden shifting framework as section 8(a)(3) claims. *OPW Fueling Components*, 343 N.L.R.B. 1034, 1039 (2004). Applying this test, the Board determined that the petitioners did not establish that Ahern's Board testimony was a motivating factor in his discharge.

Petitioners contend that they met their burden based on the suspicious timing of Ahern's discharge (August 3) following his testimony (May 25) and the ALJ's order authorizing new elections (July 12). Based on this timing, petitioners note that the ALJ in this case determined that Ahern's likely union support in an upcoming election combined with Casady's "shifting and pretextual" reasons for investigating the package's sender[15] suggest that Ahern's testimony was a motivating factor.

But substantial evidence supports the Board determination that the timing of Ahern's discharge did not establish a nexus between Ahern's testimony and discharge. As the Board noted, Ahern's discharge was more temporally related to the Company discovering Ahern's deceptive act (August 2) than to his May 25 testimony or the June 12 order. Moreover, as discussed above, the Board rejected the ALJ's conclusion that Casady's motivations were "shifting and pretextual." Again, although the evidence might also support the ALJ's determination, substantial evidence still supports the Board's determination that petitioners did not meet their burden of showing that Ahern's testimony was a motivating factor.

## VI.

For the foregoing reasons, we enforce the Board's order dismissing petitioners' section 8(a)(1), (3), and (4) allegations.

---

[14] Section 8(a)(4) specifically prohibits an employer from discharging or discriminating against an employee "because [he or she] has filed charges or given testimony under the Act." 29 U.S.C. §158(a)(4).

[15] The ALJ found that the Company, upon learning there would be another election, "had to reasonably expect that Ahern would, once again, provide critical support to the Union. That reality, coupled with the pretextual and shifting reasons given for Casady's investigation of the package, provides compelling evidence of a connection between Ahern's previous Board testimony and his discharge."

————————————

## DISSENT

————————————

ROGERS, Circuit Judge, dissenting. This case presents both a close factual issue and a close legal issue. Because on balance I would resolve both issues in favor of the union, I respectfully dissent.

When Ahern put down his co-worker's name as the sender of a complaint, he may have contemplated that the co-worker would get in trouble. But the ALJ explicitly found that Ahern did not so contemplate, and I would accept that conclusion. JA 10. I recognize that deference regarding fact-finding under the substantial evidence standard is accorded to the Board and not to the ALJ. But where the factual determination of an ALJ is based on a credibility determination, we may more readily conclude that the Board's determination, if indeed contrary, lacks substantial evidence. *See NLRB v. Universal Camera Corp.*, 190 F.2d 429, 430–31 (2d Cir. 1951) (L. Hand, J., on remand); *see also Tel Data Corp. v. NLRB*, 90 F.3d 1195, 1198 (6th Cir. 1996).

Assuming then that Ahern did not intend, but at most created a small possibility, that his co-worker would get in trouble, Ahern did not lose the statutory protection afforded his sending an anonymous work-related complaint. The Board of course has primary responsibility for defining what types of actions are sufficient to lose protection of the Act. But such definitional power cannot—in light of the apparent congressional policy—be so broad as to let the Board permit the termination of an employee for otherwise-protected conduct because of such a minor risk.